## ANN LOUISE WENTWORTH *v.* STATE OF MARYLAND

[No. 319, September Term, 1975.]

*Decided November 28, 1975.*

The cause was argued before MOYLAN, MENCHINE and MOORE, JJ.

*Dennis M. Henderson* and *Arthur A. DeLano, Jr., Assistant Public Defenders*, with whom was *Alan H. Murrell, Public Defender*, on the brief, for appellant.

*George A. Eichhorn, III, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General, Arrie W. Davis, Assistant Attorney General, William B. Yates, II, State's Attorney for Dorchester County*, and *Robert D. Horsey, State's Attorney for Somerset County*, on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Ann Louise Wentworth, was convicted in the Circuit Court for Dorchester County by a jury, presided over by Judges C. Burnam Mace and Charles E. Edmondson, of murder in the second degree, of kidnapping and of two counts of armed robbery. The case had been removed for

trial from Somerset County to Dorchester County. The appellant raises three contentions:

1) That an improper jury instruction was given contravening her right to due process as set out in *Mullaney v. Wilbur*, 421 U. S. 684, 95 S. Ct. 1881, 44 L.Ed.2d 508 (1975);

2) That the evidence was legally insufficient to permit the kidnapping charge and the murder charge to go to the jury; and

3) That a copy of a letter was erroneously introduced in contravention of the "best evidence rule".

Simply to set the stage factually and also to illustrate the shift in focus that occurs when an appellate court reviews the same evidence for different purposes, we note that the evidence was amply sufficient to permit the case to go to the jury on both the charge of murder and the charge of kidnapping. The initial crime and the nationwide manhunt that followed in its wake were highly publicized. On the evening of April 3 and the morning of April 4, 1974, James Mosley, the chairman of the art department at the Princess Anne Branch of the University of Maryland, was kidnapped and brutally slain. The principal State's witness was Dr. Delores Taylor, the assistant dean at Salisbury State College, with whom Mosley lived in a house trailer on Peggy Neck Road in Somerset County. The appellant was a student of Mosley's at the Princess Anne campus.

The testimony of Dr. Taylor alone sufficiently established the facts that the appellant and her husband, David Wentworth, came to the trailer at approximately 9:30 p.m. on April 3. Although there was one discussion involving the repayment of a loan of $200, the visit initially was socially convivial. The visitors were offered drinks. The appellant had two drinks and her husband four. Approximately 45 minutes into the visit, the conversation took a nasty turn when David Wentworth suddenly accused Mosley of having had an adulterous affair with Wentworth's wife, the appellant. This Mosley denied. At that point, Wentworth suddenly pulled a gun. Mosley was ordered to lie down on the floor with his hands behind his head. Wentworth then

asked the appellant if there had been an adulterous relationship and the appellant replied, "Yes." Wentworth learned from Mosley that there was a .22 caliber pistol in the bedroom. He sent the appellant to get it and later sent her back to get bullets for the gun. Wentworth loaded the gun and put it in his pocket. Under the insistent demands of Wentworth to own up to the adultery, Mosley finally said, "Well, if it means saving my life, I'll say yes."

Wentworth again told the appellant to search the bedroom area of the trailer for guns, narcotics and money. She did so. Wentworth took from Mosley the keys to Mosley's car. He gave the keys to the appellant, who went outside and started the car. Wentworth took Mosley's wallet. The appellant took some money from Dr. Taylor's pocketbook. Wentworth informed both Dr. Taylor and Mosley that he was going to take them for a ride, handcuff them to a tree and then return to search the trailer. The appellant also wiped fingerprints from surfaces which she had touched in the kitchen-dining area. Dr. Taylor seized a sudden opportunity and ran out of the trailer. She fled across a field to a neighbor's house. She summoned the police and then, with a neighbor armed with a shotgun, returned to the trailer and found no one there.

Mosley's body was found the following morning on the shoulder of a road with bullet wounds in the back of his head and across his back. A neighbor testified that she heard approximately eight shots fired at about 11:35 p.m. on the night of April 3. Two .357 and two .22 slugs were recovered from the victim's body.

An all-points F.B.I. bulletin was put out for both the appellant and Wentworth. A week later, their car was recovered in Georgia, where another car had been rented. The appellant and Wentworth were arrested on May 5, 1974, in Idaho. Five of Mosley's credit cards were in Wentworth's pocket. Also recovered was a .357 magnum which matched ballistically two of the bullets taken from Mosley's body. The evidence was legally sufficient to sustain all charges against the appellant.[1]

---

1. Wentworth's case, severed for trial from the appellant's, was removed

### The Jury Instruction under Mullaney v. Wilbur

We now turn our attention to the advisory instructions given to the jury. They were both confusing and unconstitutional. In pertinent part, the instructions ran:

"Felonious homicide in Maryland is divided into murder and manslaughter. Murder is defined as the unlawful killing of a human being with malice aforethought. Manslaughter, generally, is defined as the involuntary killing not done with a specific intent to take a life or where the killing was done with reckless and negligent indifference to the lives and safety of others and the wanton disregard of another man's life."

If a definition of manslaughter was to be given at all, the more appropriate definition would have been of voluntary manslaughter. The notion of involuntary manslaughter had no arguable relationship to the facts of this case and can only have served to confuse the jury. The instruction then went on:

"In the absence of justification, excuse, or some circumstance of mitigation, the law presumes that all homicides are committed with malice aforethought and constitute murder."

Unless the suggestion here is that the "intent to kill" is being presumed, this sentence describes no presumption at all. The absence of justification, excuse or mitigation is set out as a "given" fact from which the presumption will be launched. Since the only thing to be presumed, however, is already given as established, there is nothing left to presume. See our analysis of this meaningless statement in *Evans v. State*, 28 Md. App. 640, 349 A. 2d 300, Part IIGe. With the absence of justification, excuse or mitigation as a given fact,

to Calvert County. On February 20, 1975, he entered pleas of guilty to all four counts. He received 30 years for murder, 30 years for kidnapping and 20 years for each armed robbery, three of the sentences running consecutively for a total time to be served of 70 years.

that part of the instruction which immediately follows is incomprehensible:

> "The burden is on the person accused to show circumstances of excuse or justification to reduce the offense to manslaughter."

The thing, of course, which reduces murder to manslaughter is not "excuse or justification," which would totally exculpate a defendant, but rather some circumstance of mitigation. The placing of a burden on the accused, moreover, flies directly in the face of *Mullaney v. Wilbur*, as analyzed in *Evans v. State*, Part IIG. That part of the instruction which followed repeated the error of presuming all homicide to be murder in the second degree:

> "Where murder is divided into grades, as it is in Maryland, such a homicide is presumed to be murder in the second degree, and the burden to show that the killing was willful, deliberate and premeditated and thereby raise it to murder in the first degree is on the state.
>
> The essential difference between murder and manslaughter, therefore, is the presence or absence of malice."

In concluding this part of the instruction, the court again erroneously placed the burden upon the defendant of reducing murder to manslaughter by showing an absence of malice (what needs be negated, of course, is not malice in all of its aspects but only a single aspect — the absence of mitigation):

> "In perhaps simpler words, the burden is on the State to raise a homicide to first degree murder by showing willful premeditation and malice aforethought. The burden is on the Defendant, on the other hand to reduce murder to manslaughter by showing an absence of malice."

Even an academically incorrect instruction under

*Mullaney v. Wilbur,* however, will not require a reversal unless it operates to relieve the State of its rightful burden of proving beyond a reasonable doubt the absence of justification or excuse or the absence of mitigation, where one or more of those issues has been generated by the evidence as a genuine jury question. In looking now to see whether any issue of justification, excuse or mitigation had been generated in favor of the appellant by the evidence in the case, we will now view the evidence, and all inferences fairly deducible therefrom, in a light most favorable to the appellant, in contrast to the very opposite focus we employed in viewing the legal sufficiency of the evidence.

There was no issue generated as to either justification or excuse. The defensive theory offered by the appellant was that of coercion or duress.

The appellant herself testified that her husband was "very paranoiac and was in another fit of rage." She stated that she was deathly afraid of him once he pulled the gun and made the accusation as to adultery. She stated that as she was driving the car while her husband was holding the gun on Mosley, "I felt that I would be killed at any minute and that Mr. Mosley would be killed at any minute." She attributed her husband's irrational behavior that night to the combination of alcoholic beverages with the medication he was taking for a nervous condition. She testified that she had lived through a similar incident with her husband in 1971 when he attacked her father after similarly drinking and taking medication. She testified that on the evening of April 3, "When he pulled out the gun, his eyes changed, his eyes were glassy, it looked like he was in a trance. He acted like a maniac, he was irrational, unpredictable, without reason . . . I was terrified because I had only seen this one time before in my life and I knew that one time, which I explained earlier, was the intention of killing my father." She explained that she could not escape from her husband during the month-long flight after the killing because her husband never let her out of his sight.

A psychiatrist who had treated the appellant testified that

in his opinion, her actions on the night of April 3 were not voluntary:

"If I may elaborate, this carries right back to Ann's second memory as a child, and that was of her father choking her mother, and you might say did she participate in that, she participated by being there, but she was unable to speak for a month after that ... Because of her continued response to violent scenes that she grew up in, it was her response to lay low and do as you are told and not aggravate the beast so to speak. And by continued response or by having learned how to respond in angry violent situations, this then takes it out of her full voluntary control. She has learned to respond to violent situations by laying low and doing what you are told and not to aggravate the angry beast."

There was, to be sure, evidence pointing in the other direction, but for present purposes, we will take that version of the facts most favorable to the appellant. Assuming that all of the relevant criteria are met, duress, coercion or compulsion is ordinarily a valid defense to a charge of crime. The general rationale is well set out in LaFave and Scott, *Criminal Law* (1972), at 374-375:

"One who, under the pressure of an unlawful threat from another human being to harm him (or to harm a third person), commits what would otherwise be a crime may, under some cir-cumstances, be justified in doing what he did and thus not be guilty of the crime in question. The requirement for this defense of duress is that a threat of a human being which operates upon the defendant's mind, rather than of the pressure of a human being which operates upon his body (as where A pushes B against C, causing C to fall over the cliff where the three are standing, admiring the view). The rationale of the defense is not that the

defendant, faced with the unnerving threat of harm unless he does an act which violates the literal language of the criminal law, somehow loses his mental capacity to commit the crime in question. Rather it is that, even though he has the mental state which the crime requires, his conduct which violates the literal language of the criminal law is justified because he has thereby avoided a harm of greater magnitude. If A, armed with a gun, threatens B, a taxi driver, with death unless B drives him to the scene of a robbery planned by A, B is not guilty of the robbery which A commits at the scene, because it is better for society as a whole that B do the lesser harm (aid A in the robbery) than that B's life be lost."

See also Clark and Marshall, *Law of Crimes* (6th ed., 1958), at 325-329, and Perkins, *Criminal Law* (2d ed., 1969), at 951-955. As Chief Judge Orth pointed out for this Court in *Frasher v. State*, 8 Md. App. 439, 449, 260 A. 2d 656:

"In order to constitute a defense, the duress by another person on the defendant must be present, imminent, and impending, and of such a nature as to induce well grounded apprehension of death or serious bodily injury if the act is not done. It must be of such a character as to leave no opportunity to the accused for escape. Mere fear or threat by another is not sufficient nor is a threat of violence at some prior time. The defense cannot be raised if the apprehended harm is only that of property damage or future but not present personal injury."

There is one critical limitation upon the defense of duress, which leaves the appellant here utterly bereft in terms of possible total exculpation as to the murder. Whatever the psychological reality may be, the law, as a matter of social policy, has declared that the defense of duress may not extend to the taking of an innocent person's life.

As Sir William Blackstone put it in 4 *Commentaries* *30,

an accused "ought rather to die himself than escape by the murder of an innocent." Perkins, *op.cit.*, provides a modern rationale for the refusal of the common law to recognize such a defense, at 952:

> "The refusal of the common law to excuse one who has intentionally taken an innocent life to save his own is due, not to any notion that the rule of law will serve as an effective deterrent in such an emergency, but to an unwillingness to place the stamp of approval upon such conduct."

Whatever the rationale, the law is now clear. LaFave and Scott, *op.cit.*, points out, at 376:

> "It has been held that duress cannot justify murder — or, as it is better expressed (since duress may justify the underlying felony and so justify what would otherwise be a felony murder), duress cannot justify the intentional killing of (or attempt to kill) an innocent third person."

Perkins, *op.cit.*, is equally emphatic, at 951:

> "The common law does not recognize any compulsion, even the threat of instant death, as sufficient to excuse the intentional killing of an innocent and unoffending person, and hence it is also not a defense to a prosecution for an assault with intent to murder."

It was to this point that we spoke in *Frasher v. State*, at 8 Md. App. 447-448:

> "The voluntary requirement of the criminal act relates directly to compulsion; *it is a defense as to all crimes except taking the life of an innocent person* that the defendant acted under a compelling force of coercion or duress. 1 *Wharton's Criminal Law* (Anderson) § 123, p. 261." (Emphasis added)

That the appellant does not have a genuine jury issue with respect to justification or excuse, however, does not

120

necessarily deprive her of a genuine jury issue with respect to mitigation. As we recognized in *Shuck v. State*, 29 Md. App. 33, 349 A. 2d 378, in dealing with mitigation by way of "imperfect" self-defense:

> "Although by far the most common form of mitigation is that of a hot-blooded response to legally adequate provocation, this is not the only form of mitigation that will negate malice and will reduce what might otherwise be murder to manslaughter."

It was of this very possibility that we spoke in *Evans v. State*, Part IC, at n. 4:

> "This analysis presupposes that the type of mitigation fairly in issue is of the common and orthodox 'hot blood in response to legally adequate provocation' variety. The foreclosing effect of a first-degree murder conviction would not, however, apply in those very rare cases where manslaughter is predicated upon the far more esoteric extenuating circumstances, 'not yet far advanced,' of 'an "imperfect" right of self-defense or defense of others, or of crime-prevention, or of the defenses of coercion or necessity, in which the killing, though not justifiable, is not bad enough to be murder.' LaFave and Scott, *Criminal Law* (1972), § 77, 'Other-Extenuating-Circumstances Voluntary Manslaughter,' pp. 583-586. This qualification, it should be noted, is little more than an academic possibility." (For yet a second time, the qualification is more than academic.)

We find highly persuasive the rationale of LaFave and Scott, *op.cit.*, at 585:

> "One who is coerced by another person, or forced by the pressure of natural physical circumstances (e.g., thirst, starvation) into committing what is otherwise a crime, may have in some circumstances

a complete defense to the crime, but not if the crime in question consists of intentionally killing another human being. Thus one who, not in self-defense or defense of another, kills an innocent third person to save himself or to save another is guilty of a crime. But it is arguable that his crime should be manslaughter rather than murder, on the theory that the pressure upon him, although not enough to justify his act, should serve at least to mitigate it to something less than murder. Two of the latest state criminal codes so provide."

Similarly persuasive is Perkins, *op.cit.*, at 951:

"It has been suggested, quite properly, that such compulsion may negative the element of deliberation and premeditation needed for conviction of one type of first-degree murder, but the possibility that it might disprove malice aforethought and place the homicide in the category of manslaughter has not received adequate attention. Despite indications to the contrary the law should take notice of the fact that the circumstances are extremely mitigating in such a case. The state of mind of one who takes an innocent life as the only means of saving his own, while not guiltless, is certainly not malicious, and this at times has had legislative recognition."

Recognizing that an "imperfect" defense of duress may not exculpate a defendant in an unlawful homicide case but may supply that mitigation necessary to lower the degree of guilt from murder to manslaughter, we conclude that the appellant here had a genuine jury issue as to mitigation. As a result, the jury instruction which improperly placed upon her the burden of proving mitigation and which improperly relieved the State of its burden of proving the element of non-mitigation beyond a reasonable doubt requires a reversal under *Mullaney v. Wilbur* as analyzed in *Evans v. State.*

### The "Best Evidence" Rule

The appellant challenges the introduction of a typewritten copy, contained in an FBI report, of a handwritten original letter from her to State's witness Donald Miller. Miller was a retired government employee, whose hobby was gun collecting. He had met the appellant several years before the occurrence of the crime in this case. In that brief meeting, they had discussed the subject of guns and the appellant obtained Miller's address. The letter, which is the subject of the present contention, was ostensibly written by the appellant to Miller on March 10, 1974, approximately three weeks before the crime in this case. The appellant lodged a timely objection to the introduction of the typewritten copy in contravention of the "best evidence" rule.

We have discussed the "best evidence" rule on a number of occasions. *Forrester v. State,* 224 Md. 337, 167 A. 2d 878; *Gray v. State,* 181 Md. 439, 30 A. 2d 744; *Andresen v. State,* 24 Md. App. 128, 331 A. 2d 78; *Nutt v. State,* 16 Md. App. 695, 299 A. 2d 468. In *Anderson v. State,* 9 Md. App. 532, 539, 267 A. 2d 296, we discussed the burden upon the State to explain its failure to produce the original document:

> "2 Wharton, *Criminal Evidence,* § 593 indicates that it must be shown that the documents are lost or destroyed without the fault of the party tendering proof of the same. In *Duggins v. State,* 7 Md. App. 486, 256 A. 2d 354, this Court held that an original warrant must be produced to establish the validity of arrest where its existence or contents is challenged, but we pointed out the exception where the warrant was unavailable for some reason other than the fault of the prosecution."

The State in this case has been very candid, acknowledging in its brief:

> "Appellee would concede that the State apparently has not met the burden under *Anderson v. State, supra,* in showing that the original could not be produced."

The State claims, however, that the error is harmless because the appellant acknowledged having written the letter, claiming that she wrote it at the direction of and under orders from her husband. The acknowledgment of that fact, however, does not dispose of the problem posed by the "best evidence" rule. The rationale behind the rule was well stated by McCormick, *Law of Evidence* (1st Ed. 1954), at 410:

> "The policy-justification for the rule preferring the original writing lies in the facts (1) that precision in presenting to the court the exact words of the writing is of more than average importance, particularly as respects operative or dispositive instruments, such as deeds, wills and contracts, since a slight variation in words may mean a great difference *in rights,* (2) that there is a substantial hazard of inaccuracy in the human process of making a copy by handwriting or typewriting, and (3) as respects oral testimony purporting to give from memory the terms of a writing, there is a special risk of error, greater than in the case of attempts at describing other situations generally. In the light of these dangers of mis-transmission, accompanying the use of written copies or of recollection, largely avoided through proving the terms by presenting the writing itself, the preference for the original writing is justified."

In the present case, it was not simply the fact of authorship that mattered but the very contents and wording of the letter because of the light which that might throw upon the state of mind of the appellant. The significance of the letter would have been to erode the appellant's claim of duress, by showing that she herself had an interest in guns and in shooting. Such an insight into her state of mind would also have gone to contravert the testimony of the psychiatrist who appeared on her behalf and indicated that she had a lifelong antipathy to violence and to violent situations. Because of the impact which the contents and phrasing of the letter may have had upon this critical

defense issue, we cannot say that the failure to produce the "best evidence" of the contents of the document in this regard was harmless.

> *Judgments reversed; case remanded for a new trial.*