51 A.3d 623

**Nathaniel Paul McMILLAN**

v.

**STATE of Maryland.**

**No. 132, Sept. Term, 2008.**

Court of Appeals of Maryland.

Aug. 24, 2012.

Michael T. Morley (c/o Office of the Maryland Public Defender, Baltimore, MD), on brief, for petitioner/cross-respondent.

Sarah Page Pritzlaff, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent/cross-petitioner.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY *, ADKINS and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

BELL, J.

The petitioner, Nathaniel Paul McMillan, was tried by a jury in the Circuit Court for Prince George's County for the murder of Herman Haiss, a former neighbor. His defense at trial was that his participation—knocking on the victim's door, which allowed his two acquaintances to gain entrance—in the crimes with which he was charged, first-degree premeditated murder, first degree felony murder and second-degree murder,[1] was coerced. Accordingly, he requested that the jury be

---

* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court; he did not participate in the decision and adoption of this opinion.

1. Although, having gained entry on the basis of the petitioner's knocking on the door, the two men, whom the petitioner argued coerced him

instructed on the defense of "duress." The trial court refused to give to the jury the requested duress instruction. Acquitted of first-degree premeditated murder and second-degree murder, but convicted of first-degree felony murder, the petitioner noted an appeal to the Court of Special Appeals, where he argued that the trial court's refusal to instruct the jury with respect to duress was error. That court affirmed the judgment of the Circuit Court, *McMillan v. State*, 181 Md. App. 298, 362, 956 A.2d 716, 754 (2008), although rejecting, in the process, the State's argument that the defense of duress is not applicable to felony murder. *Id.*, 181 Md.App. at 328, 956 A.2d at 734. Neither the petitioner nor the State was completely happy with that result. Accordingly, when the petitioner filed, in this Court, a Petition for Writ of Certiorari, to challenge the intermediate appellate court's application of the duress defense, the State cross-petitioned for certiorari, seeking review of that court's threshold determination as to the applicability of the defense.

We granted both the petition and the cross-petition. *McMillan v. State*, 406 Md. 744, 962 A.2d 370 (2008). Therefore, before us for decision is the threshold issue of whether the defense of duress is an available, viable one to the charge of felony murder. If it is, we then must decide whether, in this case, the Court of Special Appeals correctly defined the elements of the defense, and whether, in a criminal case, an element of the duress defense is that the defendant have attempted at the earliest possible opportunity to stop or thwart the offense he was compelled to commit.

We agree with the Court of Special Appeals and, therefore, shall hold that, in Maryland, duress is a defense to felony murder. On the other hand, we side with the petitioner with regard to its application in this case and hold that, to establish and be entitled to the defense, a defendant need not first prove that he or she attempted to stop or thwart the offense that he or she alleged that he or she was compelled to commit.

---

to do so, robbed and murdered the victim, the petitioner was not charged with robbery.

Therefore, we shall reverse the judgment of the Court of Special Appeals and remand for a new trial.

## I. *Duress As Defense To Felony Murder*

The victim, on November 16, 2005, was found dead in his home on Cree Drive, in Forest Heights, Maryland, by his daughter-in-law. He had been bludgeoned to death with a baseball bat, which was found next to his corpse. The house had been ransacked, and most of the numerous weapons, including a .357 caliber pistol, three modern rifles, three shotguns, and three muzzleloaders, that the victim, a hunter, kept stored in a home safe, were missing. The word "Crips" was spray painted on a wall near the victim's body.

The petitioner was arrested about a month later, on December 16, 2005, in connection with the murder. Approximately 12 years earlier, he had been the victim's neighbor, living with his aunt and uncle in the house next to the victim's home. Thus, the petitioner knew the victim and his grandchildren and, during the two years he lived next door to him, had spent time in the victim's home.

After he had been interrogated for seven hours and given the police detectives several conflicting stories about what happened on the evening of the murder, the petitioner was charged with, and subsequently tried for, the victim's murder. The petitioner maintained throughout the interrogation that he did not go into the victim's home; that he never threatened or attacked the victim; and that, other than knocking on the door, he did not participate in the robbery in any way. No DNA or fingerprint evidence connecting the petitioner to the crimes was recovered from the scene.

At some point during the interrogation, which was recorded, the petitioner professed to being afraid of his two acquaintances, "S.O." and "Vel," and what they would do to him if he did not do what they wanted him to do: facilitate their entry into the victim's house by knocking on the door. The petitioner thus began to suggest, which became the basis of his contention at trial, that whatever he did was done under

duress. The petitioner told one of the detectives that S.O. and Vel picked him up in a green SUV at his place of work and that he asked them to give him a ride home. When, shortly thereafter, he noticed that S.O. was not driving toward his home, but in the direction of Forest Heights, he said he protested, "I don't live this way." S.O.'s response was that they were all going to Forest Heights so that the petitioner could knock on the victim's door. The petitioner then said that he told S.O. he didn't want anything to do with a robbery, to which S.O. responded, "it's GBA [guilt by association], you get down or you lay down, you gonna be with that old man in the house or you gonna leave out the house with us, which one you wanna do?" Given that choice, the petitioner indicated that he acceded, telling them, "I'll knock on the door."

A portion of the interrogation, including a short colloquy between Detective Nelson and the petitioner, that was played for the jury, further addressed and supported the petitioner's fear and the petitioner's contention that his actions in connection with the murder and other related crimes committed on the victim were coerced:

"DET. NELSON: You felt pressure to do that [knock on Haiss's door] for them [S.O. and Vel]. If you didn't do it, you'd probably be dead right now, don't you think?

"MCMILLAN: I probably be dead because they killing everybody.

"DET. NELSON: And that's why you did it."

Later in the interview, the petitioner said that he was "forced to go get the door open," that he was "compelled" to open the door, and that if he refused, he would be killed. Still later, when recounting his interaction with S.O. and Vel the day after the murder, the petitioner recalled an event that confirmed his fear and the basis for his feeling coerced. He said that once S.O. and Vel had told him the details of how the victim ultimately was murdered, S.O. went into a back room of the petitioner's home and loaded a .357 pistol with bullets. When S.O. re-emerged, the petitioner said that S.O. asked the petitioner whether the petitioner had told anyone what hap-

pened the night before. When the petitioner responded, "No," S.O., he related, said, "Good, because I don't want any harm to come to you." This was, the petitioner argued at trial, "some evidence" of duress, sufficient to support a jury instruction.

There was, to be sure, evidence that contradicted the notion that the petitioner was coerced or acted under duress. Much of that evidence came from the same source as that upon which the petitioner relied: his own statement. When first arrested, the petitioner did not claim that he was forced to knock on the victim's door or was, in any way, coerced. Indeed, the petitioner maintained that he was not involved in the crimes at all. He did say, however, that he had heard that his acquaintance, "S.O.," was responsible.[2] To support that statement, he told Detective Hollowell that S.O. tried to sell him a .357 pistol that allegedly came from the victim's home. Later in the interview, the petitioner admitted that he drove S.O. and another acquaintance, Vel, to the victim's home because he was familiar with the victim, and it was likely the victim would open his door for the petitioner. He also acknowledged that, as soon as the victim opened the door, S.O. and Vel entered the home and robbed him.

The petitioner admitted, as well, that prior to the incident, S.O. and Vel asked him for specific information about the victim, such as his age, his daily routine and schedule, whether he had an alarm system and weapons in the house, and whether he had family in the home. According to the petitioner, S.O. and Vel told him that they were going to knock on the victim's door and "[f]uck him up once he opened the door."

As indicated, the petitioner knocked on the door, and it was in response to that knock that S.O. and Vel gained entry to the victim's home. The petitioner gave inconsistent statements as to what happened after that. He said variously that he left the house immediately after knocking on the door; that he left the house and sat in the SUV; or that, after waiting in the

---

2. S.O. was later identified as Sean Hill.

SUV, he went back to the house to tell S.O. and Vel to hurry. After the crimes had been committed, the petitioner reported that the three men drove back to a house to "play" with the stolen weapons, and that S.O. later drove the petitioner home.

In his statement, the petitioner said that, on the day after the murder, S.O. and Vel came to his house and, while there, described in detail what happened to the victim once they gained entry to his home: first, Vel beat the victim, and then Vel and S.O. located one of the victim's weapons; the victim denied having other weapons, but Vel and S.O. found the gun safe and, by threatening to cut off his fingers and beating his head with a baseball bat, forced the victim to open it.

At trial, Thomas Gray, who lived across the street from the victim, testified for the State. He testified that, on November 15, 2005, he saw three or more young men in white t-shirts, whose faces he did not see, walking up and down Cree Street near a green SUV. Approximately 30 to 40 minutes later, he saw the men running down the street carrying bags. Gray did not, and could not, identify the young men.

Devonshire Majors, who was acquainted with the petitioner, also testified as a State witness. Her testimony tended to implicate the petitioner as a principal, and a voluntary one, in the crimes. She said that, around Thanksgiving of 2005, she heard the petitioner tell her boyfriend that he "got a move to go on with something." She explained that a "move" refers to any type of crime, including robbery. Majors also testified that she overheard the petitioner say that the "move" was going to be against someone on his "old street," Cree Drive. Majors said that, some time after she heard about the murder on television, McMillan told her boyfriend that he had to "roll out" and "can't come around no more."

Other State witnesses, Antonio Gooding and Victoria Wynn, contradicted the petitioner's duress defense. Gooding testified that, around Thanksgiving of 2005, after the murder, the petitioner offered to sell him a weapon for $300 or $400. Wynn, S.O.'s girlfriend at the time of the murder, testified that she let S.O. drive her green SUV, that, around Thanks-

giving of 2005, she saw the petitioner and S.O., in her house with guns, and that, at that time, the petitioner did not look scared or threatened.

The petitioner did not put on a case. His defense of duress was based on his statement and cross examination of the State's witnesses. Believing the issue to be a jury question, that the record contained some evidence that would permit the jury to find that the actions he took in furtherance of the crimes committed by S.O. and Vel were coerced and, therefore, that he acted under duress, the petitioner requested that the trial judge instruct the jury on duress. He requested that the Pattern Instruction, Maryland Criminal Pattern Jury Instructions ("MPJI–CR") 5.03 [3] be given. This prompted the following discussion between counsel and the trial judge:

> "DEFENSE COUNSEL: I am also . . . requesting . . . the duress instruction, because at the point when he realizes . . . they brought him to the scene, then he realizes the man is home and they threaten him.

* * *

---

**3.** Maryland Criminal Pattern Jury Instructions, MPJI–CR 5.03 provides:
"You have heard evidence that the defendant acted under the influence of an overpowering force. This is called duress. Duress will excuse an act that would otherwise be criminal. You are required to find the defendant not guilty if all of the following four factors are present:
 "(1) the defendant actually believed that the duress placed [him] [her] in immediate and impending danger of death or serious bodily harm;
 "(2) the defendant's belief was reasonable;
 "(3) the defendant had no reasonable opportunity for escape; and
 "(4) the defendant committed the crime because of the duress.
"The defense of duress is not established by proof that the defendant had been threatened with violence at an earlier time. [He] [she] must have been under a present threat at the time of the actual commission of the crime charged. "In order to convict the defendant, the State must prove that the defendant did not act under duress. This means that you are required to find the defendant not guilty unless the State has persuaded you, beyond a reasonable doubt, that at least one of the four factors of duress was absent."
As we shall see, *infra,* this instruction is consistent with the law as enunciated in *Frasher* and *Wentworth.*

"THE COURT: My recollection is that the law is very clear that duress must be imminent.

"DEFENSE COUNSEL: Correct, Your Honor.

"THE COURT:—a threat of direct physical harm to the individual at that moment.

"DEFENSE COUNSEL: Correct. That's absolutely correct.

"THE COURT: Not weeks later, or weeks before.

"DEFENSE COUNSEL: Correct.

"THE COURT: And I don't think there was any evidence of, he was in immediate and impending danger of death or serious bodily harm if he did not participate in this crime.

"DEFENSE COUNSEL: Well, I would beg to differ on that. Even the Detective's testimony, I mean—

"THE COURT: The Detective's testimony ... was it was only after the fact were they threatening him not to tell.

"DEFENSE COUNSEL: No. No. His testimony was, he talked about, 'You felt compelled to do it. You felt compelled.' And then the Detective actually said, 'You thought you would be dead if you didn't.'

"THE COURT: Right.

"DEFENSE COUNSEL: That's at the time of the event.

"THE COURT: Then he changed his story after that. I mean, that was just to get the Defendant to give a statement, and then the Defendant's ultimate statement was different than that. But the bottom line is, in order for duress to occur, there has to be a situation in which someone is, in effect, holding a gun to his head at the time he commits the crime, and that didn't happen. There is no evidence that that happened.

"DEFENSE COUNSEL: I agree, Your Honor, but—

"THE COURT: And the testimony, even taken in the light most favorable to the Defendant, is what it says here as the defense of duress is not established by proof that the Defendant had been threatened with violence at an earlier time. So the mere fact that he was threatened—

"DEFENSE COUNSEL: I'm not arguing harm after, or harm before. I'm saying that the Detective's statement was, 'While you'—

"THE COURT: Don't tell me about the Detective's statement, tell me what the Defendant said.

"DEFENSE COUNSEL: The Defendant acknowledged that statement to be true. He said 'Yeah, they're killing everybody.'

"THE COURT: And that was midway through what he said, and that—

"DEFENSE COUNSEL: Well, I think that's a factual— that's a fact. Those are the facts in evidence that I can argue to the jury as far as his intent. Plus, it goes even further, because, I mean, we have an aiding and abetting which requires, one of the elements is willful participation—

"THE COURT: Okay. So, you've got the aiding and abetting,[4] so we've already covered that. As far as I'm concerned, aiding and abetting is already covered. Whether or not the jury finds that he was a voluntary participant. If they find he wasn't a voluntary participant, then they can say that they found that he did not aid and abet the murder of Mr. Haiss. And that is where it will go. But—

"DEFENSE COUNSEL: That's why I'm asking.

---

**4.** The aiding and abetting instruction that was given without objection, was:

"Now the Defendant is charged with the crime of murder. A person who aids and abets in the commission of a crime is as guilty as the actual perpetrator, even though he did not personally commit each of the acts that constitute the crime. A person aids and abets the commission of a crime by knowingly associating with the criminal venture with the intent to help commit the crime, being present when the crime is committed, and seeking, by some act, to make the crime succeed.

"In order to prove that the Defendant aided and abetted the commission of a crime, the State must prove: That the Defendant was present when the crime was committed; and that the *Defendant willfully participated with the intent to make the crime succeed.*

\*　　\*　　\*

"*Willful participation means voluntary and intentional participation in the criminal act.*"　(Emphasis added).

"THE COURT: and [the jury] may also feel that he was not a willing participant in the robbery. And if they do, then they will find him not to be guilty of the offense. . . . I'm not going to give them a separate instruction on duress.

"DEFENSE COUNSEL: Just so the record is clear—

"THE COURT: You may take exception to that.

"DEFENSE COUNSEL:—because of the underlying felony of robbery, duress would be usable in that. Had Mr. Haiss not died, the duress would be available under underlying robbery.

"THE COURT: Under your theory. And I've just said, no, I feel that it's entirely covered by the aiding and abetting instruction, which covers the voluntariness issue. I do not find that this case has any evidence that rises to the point of duress as an element, and I'm not going to instruct the jury to that extent. You may note your exception at this time. I will not give the duress instruction."

Urging affirmance of the judgment of the Circuit Court, the State, as a threshold matter, argues in this Court, as it did in the Court of Special Appeals, that a duress defense does not apply in this case, since the petitioner was charged with and tried for murder. Accordingly, it submits, an instruction on the defense was neither viable nor available. The State relies on *Frasher v. State,* 8 Md.App. 439, 260 A.2d 656 (1970), *cert. denied sub nom., McLaughlin v. Director, Patuxent Inst.,* 400 U.S. 959, 91 S.Ct. 360, 27 L.Ed.2d 269 (1970) and *Wentworth v. State,* 29 Md.App. 110, 349 A.2d 421 (1975). Also relying on *Wentworth,* and a number of decisions of our sister courts in other States reaching that result, *e.g. People v. Anderson,* 28 Cal.4th 767, 122 Cal.Rptr.2d 587, 50 P.3d 368 (Cal.2002); *Wright v. State,* 402 So.2d 493 (Fla.Ct.App.1981); *People v. Serrano,* 286 Ill.App.3d 485, 222 Ill.Dec. 47, 676 N.E.2d 1011 (1997), *cert. denied,* 173 Ill.2d 541, 226 Ill.Dec. 137, 684 N.E.2d 1340 (1997); *State v. Dunn,* 243 Kan. 414, 758 P.2d 718 (1988); *People v. Campos,* 108 A.D.2d 751, 484 N.Y.S.2d 907 (App.Div. 1985); *Tully v. State,* 730 P.2d 1206 (Okla.Crim.App.1986); *Pugliese v. Commonwealth,* 16 Va.App. 82, 428 S.E.2d 16

(1993), the petitioner argues the opposite, that duress is a defense to felony murder.

Neither this Court nor the Court of Special Appeals has addressed directly the question that this case presents, whether duress is a defense to felony murder. It is now well-settled, however, that the defense of duress is a viable defense in Maryland, but that it does not apply in the case of murder. *Wentworth,* 29 Md.App. at 117–19, 349 A.2d at 426–28; *Frasher,* 8 Md.App. at 447–48, 260 A.2d at 661. *See also* MPJI–CR 5.03. In *Frasher,* the Court of Special Appeals, explaining that it follows from a proposition central to our jurisprudence, that "[i]t is essential to a crime that the defendant committed a voluntary act," 8 Md.App. at 447, 260 A.2d at 661, recognized that "it is a defense as to all crimes except taking the life of an innocent person that the defendant acted under a compelling force of coercion or duress." *Id.,* 8 Md.App. at 447–48, 260 A.2d at 661, citing 1 *Wharton's Criminal Law* (Anderson) § 123, p. 261. Although acknowledging that duress could be caused by necessity, arise from circumstances, *id.,* 8 Md.App. at 448–49, 260 A.2d at 662, the court's focus, in *Frasher,* was on the other, more common form of duress, that which occurs "by the application of duress on the defendant by another person." *Id.,* 8 Md.App. at 448, 260 A.2d at 661. As to that branch of the defense, the intermediate appellate court defined its elements:

> "In order to constitute a defense, the duress by another person on the defendant must be present, imminent, and impending, and of such a nature as to induce well grounded apprehension of death or serious bodily injury if the act is not done. It must be of such a character as to leave no opportunity to the accused for escape. Mere fear or threat by another is not sufficient nor is a threat of violence at some prior time. The defense cannot be raised if the apprehended harm is only that of property damage or future but not present personal injury. 1 *Wharton's Criminal Law, supra,* § 123, pp. 262–64.... However, there appears to be accord that the defense cannot be claimed if

the compulsion arose by the defendant's own fault, negligence or misconduct.[5] 1 *Wharton's Criminal Law*, supra, § 123, p. 264; 16 C. J., Criminal Law, § 59, p. 91; 22 C.J.S. Criminal Law, § 44, p. 136; *Ross v. State*, 169 Ind. 388, 82 N.E. 781 (1907); *State v. Clay*, 220 Iowa 1191, 264 N.W. 77 (Iowa 1935); *State v. Patterson*, 117 Or. 153, 241 P. 977 (1925); *People v. Merhige*, 212 Mich. 601, 180 N.W. 418 (1920)."

*Id.*, 8 Md.App. at 449, 260 A.2d at 662. (Footnote omitted). The issue in *Frasher* was whether duress was a defense to possession of narcotics, where the defendant was compelled to enter the State by a bail bondsman who was surrendering him, *id.*, 8 Md.App. at 444–45, 260 A.2d at 659–60, at a time when he had the drugs on his person. Thus, the court's

---

5. That was the issue in *Williams v. State*, 101 Md.App. 408, 414, 646 A.2d 1101, 1104 (1994). Partly on the basis of this statement and in reliance on the ALI, Model Penal Code § 2.09 (Tentative Draft No. 10, 1960), and out-of-state cases, the Court of Special Appeals held that a defendant charged with attempted robbery with a deadly weapon, daytime housebreaking, and the use of a handgun in the commission of a crime of violence, was not entitled to the duress defense because of his own actions. The court explained:

"Because Williams's prior conduct contributed mightily to the predicament in which he later found himself, the trial court did not err in concluding that the defense of duress was inapplicable to the instant case. Here, the evidence reveals that Williams voluntarily became involved with the Eubanks' drug organization. It is unrefuted that Williams borrowed money from Rodney Eubanks. Because of his inability to repay promptly, Williams allegedly was forced to make the first drug run up to New York. He also participated in another drug run. In other words, the evidence does not suggest that he was forced to make these runs, he did this of his own volition to help pay off his debt. By becoming involved with this drug ring, Williams through his own recklessness made others aware of his connection with Eubanks, including his abductors. Williams was readily identifiable to those in the organization, including his abductors, and the abductors acted accordingly. This was a situation that would not have occurred but for Williams's association with the drug organization. Considering these facts and the applicable law, we conclude that Williams's assertion that the defense of duress applies is unavailing."

*Id.*, 101 Md.App. at 425–26, 646 A.2d at 1110. This issue was not raised as to the petitioner.

pronouncement with regard to the applicability of the duress defense to murder was dictum.

The issue of the applicability of the duress defense to murder was squarely presented in *Wentworth,* 29 Md.App. 110, 349 A.2d 421. There, the defendant was charged with, and convicted of, murder. *Id.,* 29 Md.App. at 111, 349 A.2d at 423. Her defense was duress. *Id.,* 29 Md.App. at 116, 349 A.2d at 425. The intermediate appellate court confirmed its prior holding and the analysis in *Frasher* with regard to the viability of the duress defense. *Id.,* 29 Md.App. at 118, 349 A.2d at 426. It, then, turned to the crime of murder, recalling its dictum as to murder prosecutions:

> "There is one critical limitation upon the defense of duress, which leaves the appellant here utterly bereft in terms of possible total exculpation as to the murder. Whatever the psychological reality may be, the law, as a matter of social policy, has declared that the defense of duress may not extend to the taking of an innocent person's life."

*Id.,* 29 Md.App. at 118, 349 A.2d at 426. The court also explored the rationale for the exception:

> "As Sir William Blackstone put it in 4 Commentaries, an accused 'ought rather to die himself than escape by the murder of an innocent.' Perkins, [Rollin M. Perkins, *Criminal Law* (2d ed., 1969) ], provides a modern rationale for the refusal of the common law to recognize such a defense, at 952: 'The refusal of the common law to excuse one who has intentionally taken an innocent life to save his own is due, not to any notion that the rule of law will serve as an effective deterrent in such an emergency, but to an unwillingness to place the stamp of approval upon such conduct.'

> Whatever the rationale, the law is now clear. LaFave and Scott, [Wayne R. LaFave et al., *Criminal Law,* 2d ed., 1986] points out, at 376: 'It has been held that duress cannot justify murder—or, as it is better expressed (since duress may justify the underlying felony and so justify what would otherwise be a felony murder), duress cannot justify the

intentional killing of (or attempt to kill) an innocent third person.'"

*Id.*, 29 Md.App. at 118–19, 349 A.2d at 427.

The State relies on the *Wentworth* holding, its clear statement that duress does not totally exculpate as to the crime of murder, and the recognition that, "as a matter of social policy . . . the defense of duress may not extend to the taking of an innocent person's life." 29 Md.App. at 118, 349 A.2d at 426. It takes solace, as well, in the statement in *Frasher*, that duress "is a defense as to all crimes except taking the life of an innocent person. . . ." 8 Md.App. at 447, 260 A.2d at 661. The petitioner, on the other hand, finds support in the same case, its quotation of a passage from Professor LaFave's Treatise, *Criminal Law* (1972), which, recognizing the difference between felony murder and common law murder, draws a distinction between "killing . . . (or attempting to kill) an innocent third person" and committing a felony from the commission of which accomplice liability, responsibility for the killing, is inferred. *See id.*, 29 Md.App. at 119, 349 A.2d at 427. Also of significance to the petitioner is the difference between common law murder and felony murder. It is to the former, and not felony murder, that the duress defense exception discussed in *Frasher* and *Wentworth* relates, he submits.

▮▮▮ Murder is a common law crime in Maryland, separated into first and second degrees for the purpose of punishment. *Clemons v. State*, 392 Md. 339, 373 n. 2, 896 A.2d 1059, 1079 n. 2 (2006). First degree murder includes murder that is committed in the perpetration, or attempt of, specific enumerated felonies, including robbery.[6] Under the felony murder

---

6. § 2–201. Murder in the first degree.
 (a) *In general.*—A murder is in the first degree if it is:
 (1) a deliberate, premeditated, and willful killing;
 (2) committed by lying in wait;
 (3) committed by poison; or
 (4) committed in perpetration of or an attempt to perpetrate: . . .
 (ix) robbery under § 3–402 or § 3–403 of this article; . . . .
 Maryland Code (2002, 2011 Supp.) Criminal Law Article, § 2–201. (This code section was revised by Chapter 186 of the Laws of 2009;

doctrine, the common law mens rea requirement for murder is satisfied by the actual malice of a defendant while committing the underlying felony. *Watkins v. State*, 357 Md. 258, 267, 744 A.2d 1, 5–6 (2000). Accomplice liability for the murder extends to the participants in the underlying felony, even if they did not participate in the actual murder. *Id.*, 357 Md. at 267, 744 A.2d at 6 (finding that "[i]t has long been established that, under the felony-murder doctrine, a participating felon is guilty of murder when a homicide has been committed by a cofelon in furtherance of the underlying felony.").

The defense of duress is applicable to the crime of robbery. *Frasher*, 8 Md.App. at 450, 260 A.2d at 663. That being so, the petitioner believes, therefore, that it should also apply when the robbery is the underlying felony in a felony murder charge. Pointing out that duress involves circumstances where a defendant is justified in committing a criminal act, including the felony of robbery, and absolves the defendant of criminal liability, *Wentworth*, 29 Md.App. at 118, 349 A.2d at 426, he finds Professor LaFave's statement of the rationale instructive:

"The rationale of the defense is not that the defendant, faced with the unnerving threat of harm unless he does an act which violates the literal language of the criminal law, somehow loses his mental capacity to commit the crime in question. Rather it is that, even though he has the mental state which the crime requires, his conduct which violates the literal language of the criminal law is justified because he has thereby avoided a harm of greater magnitude."

LaFave & Scott, *Criminal Law* 374–75 (1972).

To that point, the Court of Special Appeals observed: "At common law, the rationale for barring the duress defense in a prosecution for murder was that a person 'ought rather to die himself than escape by the murder of an innocent.' 5 BLACKSTONE'S COMMENTARIES 30.

however, the sections relating to first-degree felony murder remained unaltered from those in place at the time of the alleged crime here.)

This rationale disappears when the sole ground for the murder charge is that the defendant participated in an underlying felony, under duress, and the defendant's co-felons unexpectedly killed the victim, thereby elevating the charge to felony-murder. We conclude that if duress would serve as a defense to the underlying felony, it is also available as a defense to a felony-murder arising from that felony, assuming the criteria for such a defense are otherwise satisfied."

*McMillan,* 181 Md.App. at 328, 956 A.2d at 734. We agree with the Court of Special Appeals.

The intermediate appellate court has pointed out that a majority of jurisdictions that have addressed this issue have determined that duress is available as a defense. *See id.,* 181 Md.App. at 328, 956 A.2d at 734. We are persuaded by their reasoning. *See e.g. People v. Sims,* 374 Ill.App.3d 231, 267, 312 Ill.Dec. 124, 869 N.E.2d 1115, 1145 (2007), *cert. denied,* 226 Ill.2d 604, 316 Ill.Dec. 549, 879 N.E.2d 937 (2007), *Arnold v. Virginia,* 37 Va.App. 781, 787–88, 560 S.E.2d 915, 918 (2002), *MacKool v. State,* 363 Ark. 295, 302, 213 S.W.3d 618, 623 (2005) (explicating that Arkansas allows duress to be used as a defense for murder generally). Moreover, States that explicitly disallow the use of duress as a defense to felony murder, do so because of statutes. *See e.g. State v. Ellison,* 213 Ariz. 116, 131, 140 P.3d 899, 914 (2006) (relying on A.R.S. § 13–412(C) (2001)), *cert. denied,* 549 U.S. 1000, 127 S.Ct. 506, 166 L.Ed.2d 377 (2006); *Moore v. State,* 697 N.E.2d 1268, 1273 (Ind.Ct. App.1998) (citing Ind.Code § 35–41–3–8 (1993)); *State v. Ng,* 110 Wash.2d 32, 39, 750 P.2d 632, 636 (1988) (citing Rev.Code Wash. § 9A.16.060 (2)).

Disallowing the duress defense in the case of felony murder, absent a statutory imperative, would be unwarranted, in our view: a defendant could have a complete defense to the felony that forms the basis of a murder charge and be exonerated of that charge, yet, because unable to present it as a defense to the murder charge, still be convicted of felony murder. Although McMillan was not charged separately with robbery, in

this case, as in other cases, the State's argument would create unacceptable results.

## II. *Application of Duress Defense/Jury Instruction*

■ Maryland Rule 4–325 is the Rule on instructions to the jury. Section (c) of that Rule addresses when jury instructions are to be given. It provides:

> "(c) How given. The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given."

We said in *Thompson v. State,* 393 Md. 291, 302–03, 901 A.2d 208, 214 (2006) (quoting *Ware v. State,* 348 Md. 19, 58, 702 A.2d 699, 718 (1997)), that Rule 4–325(c) "requir[es] the trial court to give a requested instruction under the following circumstances: (1) the requested instruction is a correct statement of the law; (2) the requested instruction is applicable under the facts of the case; and (3) the content of the requested instruction was not fairly covered elsewhere in the jury instruction actually given."

■ The petitioner requested the trial judge to instruct the jury as to the duress defense pursuant to MPJI–CR 5.03.[7] To establish duress, it must be shown to be:

> "present, imminent, and impending, and of such a nature as to induce well grounded apprehension of death or serious bodily injury if the act is not done. It must be of such a character as to leave no opportunity to the accused to

---

7. The Maryland Pattern Criminal Jury Instructions require a defendant to meet four elements to obtain a duress instruction:

> 1) the defendant actually believed that the duress placed [him] [her] in immediate and impending danger of death or serious bodily harm; 2) the defendant's belief was reasonable; 3) the defendant had no reasonable opportunity for escape; and 4) the defendant committed the crime because of the duress.

MPJI–CR 5:03.

escape. Mere fear or threat by another is not sufficient nor is a threat of violence at some prior time"

*Frasher,* 8 Md.App. at 449, 260 A.2d at 662 (citing *Wharton's Criminal Law* (Anderson) § 123 p. 265). The duress defense is applicable when a defendant is compelled by the duress to commit the crime. *Id.,* 8 Md.App. at 450, 260 A.2d at 663. The determination of whether the defendant, in fact, was compelled to commit the crime because of duress is a question for the jury. *Id.,* 8 Md.App. at 449–50, 260 A.2d at 662.

■■■■■■■ Whether, in a given case, the evidence supports the giving of a requested instruction is a determination subject to a relatively low threshold that must be met. The defendant must show "some evidence" and then the burden shifts to the State to show, beyond a reasonable doubt, that the defense does not apply. *Dykes v. State,* 319 Md. 206, 216, 571 A.2d 1251, 1256 (1990); *see also Dishman v. State,* 352 Md. 279, 292, 721 A.2d 699, 705 (1998) (A criminal defendant must produce a "minimum threshold of evidence necessary to establish a *prima facie* case that would allow a jury to rationally conclude that the evidence supports the application of the legal theory desired"). The "some evidence" standard is that of the common usage of "some," and is well short of the showing required by the "beyond a reasonable doubt," "clear and convincing," or "preponderance" standards. *Id.* There must be some evidence to support each element of the defense, however. *Marquardt v. State,* 164 Md.App. 95, 131, 882 A.2d 900, 921 (2005), *cert. denied,* 390 Md. 91, 887 A.2d 656 (2005). The evidence presented is viewed in the light most favorable to the defendant. *Brogden v. State,* 384 Md. 631, 650, 866 A.2d 129, 140 (2005). The existence of contradictory evidence on the elements of duress does not foreclose use of the defense.[8] We said in *Dykes,* that "[i]t is of no matter that

---

**8.** The Court of Special Appeals, agreeing with the trial judge, held that, disregarding inconsistencies in the petitioner's statements, the petitioner did not make out a *prima facie* case for duress, *McMillan,* 181 Md.App. at 337, 956 A.2d at 739, and that, "even in the light most favorable to the defendant ... what is not established by proof [is] that the defendant had been threatened with violence at an earlier time."

the ... claim is overwhelmed by evidence to the contrary. If there is *any evidence* relied on by the defendant which, if believed, would support his claim ... the defendant has met his burden." 319 Md. at 217, 571 A.2d at 1257 (emphasis added).

The trial judge reasoned, and the Court of Special Appeals agreed, that the petitioner's statements to Detective Nelson did not establish that he was in impending or immediate danger because "in order for duress to occur, there has to be a situation in which someone is, in effect, holding a gun to his head at the time that he commits the crime, and that didn't happen." *McMillan,* 181 Md.App. at 316, 956 A.2d at 726. While the trial court's example illustrates an obvious situation of duress, we do not agree that it constitutes the entire universe of the scenarios that can suffice as coercive. Being threatened with weapons is not the only possibility. A jury may infer from witness testimony, including that of a defendant, that threats by identified gang members, such as S.O. and Vel, when no weapons are displayed or when there are no weapons, that the defendant had a "well-grounded apprehension of death or serious bodily injury." Indeed, in this case, without bringing a weapon to the robbery, S.O. and Vel were able nonetheless to bludgeon the victim to death brutally. The petitioner told Detective Nelson that "[S.O. and Vel] be killing everybody." The jury could infer reasonably that the petitioner was aware of a real, immediate threat posed by S.O. and Vel if he did not participate in the robbery. We are not persuaded by the State's arguments that, "there was *no*

---

We disagree. The threat of violence does not need to be repeated in order for there to be some evidence of duress. A reasonable jury could have found that the duress felt by the petitioner as a result of the statement made by S.O. to the petitioner while on the way to the victim's home continued after the car ride to the time when he knocked on the victim's door. To that point, the petitioner presented "some evidence" that he assisted in the commission of the robbery under duress, because of a fear of imminent death or serious bodily harm at the hands of S.O. and Vel. His statement indicated that he told S.O. that he would "knock on the door," in response to S.O.'s threatening question "you gonna be with that old man in the house or you gonna leave out the house with us ...?"

evidence regarding the nature of the alleged threat or how it might be carried out ...," rendering the petitioner's fear unreasonable, or not "well grounded." Those who coerce others to participate in a crime or other activities need not, and rarely will, provide details of their coercive methods or intentions. In the context of S.O.'s and Vel's gang affiliation or known criminal history, "get down or lay down" may well be menacing enough to meet the "some evidence" standard of the petitioner's fear of imminent or immediate harm.

The State argues that the petitioner aided and abetted the robbery and the murder. We do not agree. The petitioner's actions are not analogous to those of a "getaway" driver, claiming to be acting under duress, but who waits for the criminals to get back in the car and then drives them from the crime scene, in the manner urged by the State. According to the petitioner's statement, and taking it in the light most favorable to him, the petitioner did not aid any aspect of the crimes after his part, knocking on the door, was complete.

As we shall discuss, *infra*, affirmative obstructionist actions, such as attempting to thwart the crime or contacting the police, are not elements of the defense and are not required to be shown. The petitioner, accordingly, submitted "some evidence" during his trial for each element of the duress defense that the jury could have considered, thus, viewed in a light most favorable to the petitioner, justifying the requested duress jury instruction.

The petitioner argues that his requested duress jury instruction was not fairly covered by the "voluntariness" aspect of the aiding and abetting instruction. The Court of Special Appeals agreed that these jury instructions are not interchangeable, *McMillan,* 181 Md.App. at 336–37, 956 A.2d at 738–39, and so, too, do we. The trial court reasoned that, if the jury found that the petitioner wasn't a "voluntary participant" in the crime, then it would also find that he was not an aider and abetter of the murder.[9] In addition to the standard

9. The Maryland Criminal Pattern Jury Instructions for aiding and abetting, MPJI—CR 6.01, states:

aiding and abetting jury instruction, the trial court added that "[w]illful participation means voluntary and intentional participation in the criminal act." *McMillan,* 181 Md.App. at 318, 956 A.2d at 728. While voluntariness and the compulsion or coercion involved in duress are similar, they do not have the same meaning in all situations. Duress involves inherently the threat of violence, which is explained to the jury in the duress instruction. The lack of voluntariness may involve other forms of coercion that are not violent, and that a jury may not find persuasive enough to exculpate a defendant raising the defense. Here, the petitioner was not charged separately with robbery. The aiding and abetting instruction was accompanied by the trial judge's note that "the Defendant is charged with the crime of murder." The jury found McMillan not guilty of premeditated first and second degree-murder, which implicitly means that it found that he, as a principal, did not have the intent to murder the victim, or act as an aider and abetter of that murder. The aiding and abetting jury instruction, given in this case, directed the jury to evaluate whether the petitioner participated voluntarily in the murder, not in the underlying robbery; therefore, the aiding and abetting instruction did not "fairly cover" the duress instruction as to the underlying felony of robbery.

The State relies on *Frasher* for the proposition that, in order to invoke duress as a defense, McMillan must have been under duress during the entire time that the crime unfolded.

---

"The defendant is charged with the crime of (crime). A person who aids and abets in the commission of a crime is as guilty as the actual perpetrator, even though [he] [she] did not personally commit each of the acts that constitute the crime. A person aids and abets the commission of a crime by knowingly associating with the criminal venture with the intent to help commit the crime, being present when the crime is committed, and seeking, by some act, to make the crime succeed.

"In order to prove that the defendant aided and abetted the commission of a crime, the State must prove:

"(1) that the defendant was present when the crime was committed; and

"(2) that the defendant willfully participated with the intent to make the crime succeed...."

Other state appellate courts agree that the duress must be continuous throughout the commission of the crime. *See e.g. State v. Caine,* 746 N.W.2d 339, 356 (Minn.2008) (holding that "[t]he defendant's reasonable fear of instant death must continue throughout the time the crime is being committed, and it must not have been possible for the defendant to withdraw in safety."). In *Frasher,* the Court of Special Appeals, quoting Stephen, *The Digest of Criminal Law,* art. 31, observed:

"An act which, if willingly, would make a person a principal in the second degree, or an aider and abettor, in a crime, may be innocent if the crime is committed by a number of offenders, and if the act is done only because, during the whole of the time it is being done, the person who does it is compelled to do it by threats on the part of the offenders instantly to kill him or to do him serious bodily harm, if he refuses; but threats of future injury, or the command of any one not the husband of the offender, do not excuse any offense."

8 Md.App. at 454 n. 7, 260 A.2d at 665 n. 7.

Relying on decisions from our sister states, *Caine,* 746 N.W.2d at 356; *Williams v. State,* 31 Fla. L. Weekly D2334, 937 So.2d 771, 772 (Fla.App.2006); *State v. Getsy,* 84 Ohio St.3d 180, 199, 702 N.E.2d 866, 885 (1998), *cert. denied,* 527 U.S. 1042, 119 S.Ct. 2407, 144 L.Ed.2d 805 (1999); *State v. Davis,* 256 Kan. 1, 7, 883 P.2d 735, 740 (1994), the Court of Special Appeals adopts the "continuity" requirement as an element of the duress defense. *McMillan,* 181 Md.App. at 342, 956 A.2d at 742. While we, like the intermediate appellate court, find these cases persuasive, we do so for a different reason and, therefore, arrive at a different conclusion from our review of them. As we read these cases, the unit of measurement is the length of the defendant's involvement in the coerced crime. *See Williams,* 31 Fla. L. Weekly D2334, 937 So.2d at 772 (an element of duress is that "the *defendant ceased the criminal conduct* as soon as the necessity or apparent necessity for it ended") (citing *Bozeman v. State,* 714 So.2d 570, 572 (1998)) (emphasis added); *Getsy,* 84 Ohio St.3d at 199, 702 N.E.2d at 885 ("The force used to compel the

actor's conduct must remain constant, controlling the will of the unwilling actor during the *entire time he commits the act . . . .*") (emphasis added), *cert. denied,* 527 U.S. 1042, 119 S.Ct. 2407, 144 L.Ed.2d 805 (1999); *Davis,* 256 Kan. at 7, 883 P.2d at 740 (for duress to apply "the compulsion must be continuous."). These cases require duress during the time *the defendant acted,* rather than throughout the entire crime. This is particularly important in a felony murder trial where a defendant's conduct was limited to the commission of the underlying felony and not the murder itself. As the petitioner points out, this idea has been addressed and illustrated by LaFave, *Criminal Law* at 377:

> "The law properly recognizes that one is justified in aiding a robbery if he is forced by threats to do so to save his life; he should not lose the defense because his threateners unexpectedly kill someone in the course of the robbery and thus convert a mere robbery into a murder."

The petitioner argues that his participation in the robbery, by knocking on the victim's door, was under duress, and, therefore, the duress inquiry should be restricted to his actions then, rather than over the course of the time that the criminal actions of S.O. and Vel continued. We agree with the petitioner.

The State also argued, and the Court of Special Appeals agreed, that the duress doctrine does not apply if a defendant has a reasonable opportunity to escape, surrender to the authorities, or take steps to stop the crime.[10] This reasoning conflates the elements of duress and the requirement for an aider and abetter to "withdraw" from a crime. *See e.g. Cantine v. State,* 160 Md.App. 391, 411, 864 A.2d 226, 238

---

**10.** The Court of Special Appeals said that "[by McMillans's] own account, the crime was ongoing, and [McMillan] continued to aid and abet it by failing to take any step to stop it." *McMillan v. State,* 181 Md.App. 298, 341, 956 A.2d 716, 741 (2008). It further stated that, "S.O. and Vel left him outside, free to flee and call the police. If [McMillan] had done so, he might have cut short the robbery and averted Haiss's senseless murder." *McMillan,* 181 Md.App. at 342, 956 A.2d at 742.

(2004) (to completely escape accomplice liability, a defendant must act "to defeat or disavow the purposes of the conspiracy") (quoting *U.S. v. Urbanik,* 801 F.2d 692, 697 (4th Cir. 1986)).

 The defense of duress is distinct from both the aider and abetter withdrawal requirement, and the necessity defense. We agree with the petitioner that our previous explications of the elements of necessity, and the Court of Special Appeals's past application of the duress defense, have not incorporated any requirement that a defendant have sought the aid of police or attempted to thwart the crime he/she was compelled to assist. Necessity is similar to duress, except that the compulsion to act comes from "the physical forces of nature (storms, privations) rather than from human beings." *Sigma Reproductive Health Ctr. v. State,* 297 Md. 660, 675, 467 A.2d 483, 490 (1983) (quoting LaFave & Scott *Criminal Law* § 50 (1972)); *Frasher,* 8 Md.App. at 447–48, 260 A.2d at 661. *See also* MPJI–CR 5.03 Cmt., (explaining that there is not a separate pattern jury instruction on necessity because of the interrelationship between necessity and defense). To invoke the necessity defense, a defendant must 1) have been in present and imminent risk of death or bodily harm, 2) not have placed himself in the situation intentionally or recklessly, 3) not have a reasonable or legal alternative to the criminal action, and 4) stop the criminal activity when the necessity ends. *State v. Crawford,* 308 Md. 683, 698–99, 521 A.2d 1193, 1200–01 (1987) (explicating the specific requirements for necessity when unlawfully possessing a firearm); *see also Sigma,* 297 Md. at 688, 467 A.2d at 496–97 (including the additional element of measuring the gravity of the harm avoided with the harm done). The elements of duress used previously by the Court of Special Appeals, in *Wentworth,* 29 Md.App. at 118, 349 A.2d at 426, and *Frasher,* 8 Md.App. at 449, 260 A.2d at 662, discussed *supra,* do not include any requirement that a defendant invoking duress attempt to ameliorate the harm caused by his or her coerced actions or to contact the police. Further, the Maryland Pattern Jury Instructions do not require that a defendant take steps to stop

the crime in which he/she was forced to participate. Accordingly, we will not require defendants that invoke the duress defense to show, as an element of that defense, that they sought aid or otherwise attempted to thwart the crime after their escape from duress.

■■■ The petitioner submitted "some evidence" that he believed reasonably that he was in danger of immediate or impending death or bodily harm if he did not participate in the robbery. Although initially he told the detectives that he was not pressured by anyone to knock on the victim's door, his story evolved over the course of the interrogation. Later in the interrogation, he told them of S.O.'s threatening question, "you get down or you lay down, you gonna be with that old man in the house or you gonna leave out the house with us, which one you wanna do?" Detective Nelson asked the petitioner, who agreed, "If you didn't do it, you'd probably be dead right now, don't you think?" The petitioner added, "I probably be dead because they killing everybody." Further, the petitioner told Nelson that he was "forced to go get the door open," that he was "compelled" to open the door, and that if he refused, he would be killed. Together, these statements, if believed, constitute the "some evidence" of the petitioner's state of mind, in the car and leading up to, and including, his participation in the robbery, that the record must reflect to justify a duress instruction.

■■■ The petitioner produced "some evidence" that he had no reasonable opportunity to escape before knocking on the victim's door. He told the detectives that S.O. and Vel arrived at his work and told him that they would give him a ride home. Relying on this offer, the petitioner got in the car driven by S.O. and noted expressly his surprise when he realized that S.O. was driving to Forest Heights, rather than in the direction of the petitioner's home. His protests elicited S.O.'s threatening question discussed, *supra.* From this, a jury reasonably could have found that duress began. We do not require that the petitioner make a "mad dash" to escape in the space and time between when the SUV was parked and

when he knocked on the victim's door in order to prove that an escape route was not reasonable. The question of the reasonableness of the fear in a particular situation is one for the jury to weigh. In describing the onset of potential duress and the effect of his resultant behavior, the petitioner met his burden, and provided "some evidence" that met the low threshold required for giving the jury instruction sought here.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PRINCE GEORGE'S COUNTY.**