*Darwin Naum Monroy Madrid v. State of Maryland*, Case No. 1937, September Term, 2017. Opinion by Meredith, J.

**CRIMINAL LAW – HOMICIDE – CLAIM OF DURESS.** Duress is not a defense to an intentional murder of an innocent person, but could, under circumstances where all elements of duress are present, mitigate the crime of murder to voluntary manslaughter. But a threat of harm at a future time does not support the mitigation defense of duress. The threat of harm must be a present threat of immediate death or serious bodily injury that will be inflicted if the coerced act is not carried out. And a claim of duress is not available to a defendant who intentionally or recklessly placed himself in a situation in which it was reasonably foreseeable that he would be subjected to coercion.

**CRIMINAL LAW – PARTICIPATION IN A GANG.** Maryland Code, Criminal Law Article, § 9-804 prohibits a person from participating in a criminal gang by committing or participating in a crime listed in § 9-801, knowing that the gang has committed, attempted to commit, or solicited two or more of the crimes listed in § 9-801.

**CRIMINAL LAW – CUSTODIAL INTERROGATION – INCRIMINATING STATEMENT – IMPROPER INDUCEMENTS.** In order for the prosecution to introduce an incriminating statement that was made by a defendant during a custodial interrogation, there must be a showing that: the defendant was advised of the defendant's right to remain silent, the right against self-incrimination, and the right to counsel, in accordance with *Miranda v. Arizona*, 384 U.S. 436, 467 (1966); the defendant must have knowingly and voluntarily waived the *Miranda* rights; and the interrogating officers must not have induced the defendant to make an incriminating statement by threatening the defendant or by making promises or representations that the defendant would be given special consideration or assistance in exchange for making the statement. But a mere exhortation to tell the truth is not enough to make a statement involuntary.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1937

September Term, 2017

DARWIN NAUM MONROY MADRID

v.

STATE OF MARYLAND

Meredith,*
Berger,
Nazarian,

JJ.

Opinion by Meredith, J.

Filed: October 1, 2020

*Meredith, J., now retired, participated in the argument and conference of this case while an active member of the Court; after being recalled pursuant to Maryland Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this Opinion.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

At the conclusion of a jury trial in the Circuit Court for Prince George's County, Darwin Naum Monroy Madrid ("Madrid"), the appellant in this case, was convicted of participating in the murder and attempted murder of two members of an enemy gang in Prince George's County. He was also convicted of two counts each of first-degree assault, use of a handgun in the commission of a felony or crime of violence, conspiracy to commit first-degree murder, and participation in a criminal gang in violation of Md. Code (2002, 2012 Repl. Vol., 2015 Supp.), Criminal Law Article ("CL"), § 9-804. After sentencing, he noted this direct appeal.

## QUESTIONS PRESENTED

Madrid asks this Court:

1. Did the circuit court err in denying Mr. Madrid's motion to suppress his custodial statements to police?

2. Did the trial court err by refusing to instruct the jury on the defense of duress?

3. Is the evidence insufficient to sustain Mr. Madrid's convictions for participation in a criminal gang under § 9-804(a) of the Criminal Law Article?

We answer "no" to all three questions, and shall affirm the judgments of the Circuit Court for Prince George's County.

## FACTS AND PROCEDURAL HISTORY

The following facts are drawn from the evidence presented at Madrid's trial.

In 2014, at the age of 14, Madrid immigrated to the United States from Guatemala, and resided with his mother, stepfather and sister in Prince George's County. He began to attend high school, where he took classes that included English as a second language, algebra, and science. On one occasion when he was in one of the school's restrooms, some individuals attempted to rob him, but some members of the MS-13 gang came to his defense and prevented the robbery. After that experience, he began to develop a relationship with the gang members who had come to his defense, and he began to do favors for them, such as giving them $10 or $15 when they needed money.

With the passage of time, the MS-13 gang members with whom he associated would give him assignments, or "orders," for him to perform duties for them. One order was for him to report "anything strange," such as the sighting of a member from another gang. He considered himself to be an "esquina" (entry-level member of the lowest rank) in the MS-13 gang. Another assignment he would be asked to perform from time to time was to "pick up rent" from individuals who had small businesses such as selling beer without a license or selling drugs. The largest amount of rent he had picked up for the gang was $1,500. Many times, the orders given to Madrid would be communicated via telephone from an individual in El Salvador named Delincuente, who was the highest ranking gang member with whom Madrid had any contact. He described Delincuente as "the Word," the person who gives orders to other gang members. Madrid indicated that the frequency of the orders he was given increased over time. He explained: "It gets to

2

the point where it's . . . almost daily." And he said that, if a gang member does not follow the rules, "[t]hen the person gets punished."

Madrid testified that he had been punished only once. At one point after he had been in the gang a few months, he attempted to limit his entanglement with MS-13 by failing to always answer the phone when they called, failing to return some of the phone calls, and making excuses to avoid some of their requests. As a result, he received "a minor punishment" the gang called "Thirteen seconds." For thirteen or so seconds, three members of the gang hit him with their bare hands, but, he said, "I didn't have like big injuries, major injuries." But he understood that the MS-13 gang sometimes administers more serious punishments, such as beating the offender with bats to the point of breaking legs or inflicting death.

On the evening of April 16, 2016, Madrid went to the Galaxy nightclub. While there, he met up with three other MS-13 gang members he knew as Alex, Henry, and Hellboy. He received a phone call from Delincuente, who called from El Salvador to ask him to look around the club and report back whether there were members of another gang at the nightclub. Madrid was ordered to check particularly for members (he described as "chavalas" or chavalos) from the 18th Street gang. Madrid did not see any chavalas, but Hellboy assured him that he had seen them. So Madrid called Delincuente and told him that the enemy gang members were there. He was told to wait at the nightclub.

Madrid went outside to wait for further instructions. Another MS-13 member he knew as Stuart came out to wait with him. After a few minutes, he received another call. The instructions were to go to the residence of an enemy gang member named Carlos

Tenorio-Aguirre and wait there until Carlos came home that night. So Madrid and Stuart scurried to the apartment complex where they knew Carlos resided, running most of the way.

Soon after Madrid and Stuart arrived at the apartment complex, a car appeared. Madrid did not know who was in the car, but Stuart approached the car and was given a backpack. The car then departed. In the backpack were three guns. Stuart gave one of the handguns to Madrid. They were then joined by Alex and Hellboy, who waited with them until Carlos and another member of the 18th Street gang—Gamaliel Nerio-Rico—returned home.

According to Madrid's testimony at trial: "We waited for them to park the car and to get out of the car." And then: "We made the attack. We tried to carry out the orders we were given." Madrid, along with two other members of the MS-13 gang, shot at Carlos and his companion Gamaliel for "10 to 15 seconds. It was fast." Both of the targeted men appeared to be dead. The attack was captured on video surveillance recordings in which Madrid was plainly visible, as he admitted when he was on the witness stand.

After the ambush, Madrid and the other three members of the MS-13 gang ran to the back of the apartments, and then ran to an isolated location. They put the three firearms back in the backpack. The same car that had delivered the backpack showed up, and Stuart gave the backpack to a person in the car, which then drove away.

On the evening of April 18, 2016, Madrid was arrested at his mother's apartment building. At the police station, he gave a video-recorded statement to Detective Luis

4

Cruz, the homicide detective who interviewed him in Spanish, Madrid's native language. In the statement, Madrid admitted he had shot the enemy gang member who died (Nerio-Rico), and had emptied his gun shooting at the second enemy gang member (Tenorio-Aguirre) who survived despite being struck by twelve bullets.

The grand jury for Prince George's County indicted Madrid on nine counts: murder (Count 1); attempted first-degree murder (Count 2); two counts of first-degree assault (Count 3 and Count 4); two counts of use of a handgun in a felony or crime of violence (Count 5 and Count 6); two counts of participating in a criminal gang (Count 7 and Count 8); and conspiracy to commit murder (Count 9).

Prior to trial, Madrid filed a motion to suppress the recorded statement he gave to Detective Cruz, arguing: (1) that the *Miranda* advisement was inadequate for him to knowingly waive his rights; and (2) that his incriminating responses were not voluntary because the interviewing detective had improperly induced him to confess. The court denied the motion to suppress his statement.

At trial, Madrid did not dispute his participation in the murder and attempted murder. The version of facts set forth above is based upon Madrid's own trial testimony. His fellow gang member Manuel "Alex" Beltran also testified at trial and identified Madrid in the video recording of the attack that was admitted into evidence at trial. Madrid testified at trial that he shot the members of the 18th Street gang to carry out an order he had been given by the person in El Salvador named Delincuente, whom he had never met but with whom he had spoken on the phone multiple times. Madrid testified that, if he disobeyed an order from a superior in the gang, he would be punished by

5

members of the MS-13 gang, and punishment could include severe beatings and even death. Madrid testified that he shot the two members of the 18th Street gang because, if he did not carry out the order of a "green light" for Carlos, "that green light would have been for me." He did not assert, however, that he had received any specific threat on April 16 or 17 prior to the time he participated in the shooting of the enemy gang members. The trial court rejected Madrid's request to instruct the jury regarding duress as a possible mitigating factor.

The jury convicted Madrid on all counts. After sentencing, this appeal followed.

## I.       Motion to Suppress

Prior to trial, Madrid filed a motion to suppress the statement he gave to Detective Cruz, contending that it was obtained from him in violation of the Fifth Amendment because the advisement of *Miranda* rights was inadequate for him to knowingly waive his rights, and the incriminating statement was involuntary under the United States Constitution, the Maryland Declaration of Rights, and Maryland common law.  Madrid argued that, among other things, his young age, lack of prior contact with the justice system, status as a recent immigrant to the United States, and the short of amount of time which Detective Cruz spent reading Madrid the *Miranda* advisement—which Madrid calculated at 36 seconds—added up to circumstances under which the court should conclude that his waiver of rights was neither knowing nor voluntary, and the incriminating statement was not made voluntarily.

Detective Cruz was raised speaking Spanish. His parents are from El Salvador, and he still speaks to them in Spanish. He conducted the interview of Madrid in Spanish.

6

A transcript of the interview which included both the Spanish interview and an English translation was admitted in evidence at the suppression hearing, at which both Detective Cruz and Madrid testified.

Detective Cruz testified that he interviewed Madrid at approximately 11 p.m. on the night of April 18 at the Criminal Investigations Division. The interview was recorded, and the suppression court reviewed the audio-video recording. The recording showed that Detective Cruz was unarmed and dressed in business attire. Detective Cruz and Madrid spoke to each other in Spanish. Voices were not raised. Detective Cruz did not have Madrid sign a written waiver of rights form, but the detective read the *Miranda* rights advisement from a card and, after reading each element of the *Miranda* advisement, he looked at Madrid and asked "O.K.?" to assure himself that Madrid understood. According to Detective Cruz, Madrid nodded in the affirmative. Madrid never gave him any reason to suspect that he did not understand any part of the advisement. The suppression court agreed with the detective's testimony that Madrid responded "si" when Detective Cruz asked him after the final advisement: "Do you understand, do you understand the rights? Yes? Yes?"

Detective Cruz testified that Madrid gave no indication of being under the influence of alcohol or drugs, and that he was "a bit apprehensive, but cooperative" and "responsive" to the questions. Detective Cruz testified that Madrid never asked to see or speak to an attorney or his parents or anyone else outside the room. Detective Cruz also testified that he made no promises or threats to Madrid, and specifically denied ever telling him that it would be "better for him" if Madrid talked to the police.

7

Madrid testified that he was "cold" and "disoriented" when he was placed in the interview room. Madrid testified that he did not remember Detective Cruz reading him his rights. Madrid could not say that he either understood or did not understand his rights because he did not remember them being addressed. Madrid claimed that, while at the station, before being placed in the interview room where his statement was recorded, Detective Cruz opened the door and told Madrid it would be better for him if he talked. But Madrid also testified that his response to that statement was that he "just stayed quiet."

There was no claim of any physical abuse or verbal threat. At the suppression hearing, defense counsel pointed to just two specific statements he attributed to Detective Cruz that allegedly overbore Madrid's will to remain silent. The first was the alleged statement that Detective Cruz said that it would be better for Madrid if he talked. But, even Madrid said that this comment was made before the interview began, before the *Miranda* advisements were given, and that his response was to stay quiet. The second statement that was alleged to be coercive was made by Detective Cruz early in the interview after Madrid asserted that nothing unusual had happened after he left the Galaxy nightclub on the night in question. Detective Cruz then said: "I can play this game with you all night if you want, but I'm not in that kind of, of, of, I don't wanna waste time, understand? I know in your mind you know why you're here O.K.?" But the transcript of the interview shows that, even after that statement was made, Madrid continued to maintain: "I don't know what you're talking to me about."

8

It was only after Detective Cruz told Madrid of the extensive amount of incriminating evidence that the investigators had already gathered that Madrid decided he wanted to confess. In the transcript, the following comments were made by the detective immediately before Madrid's first inculpatory admission:

> [CRUZ:] Your mom[,] even though she says this last year you lost it somewhat, she says you're a hard worker, but that you spend too much time on the street. I know it's, it's easy to get lost in this country, this country's damned [sic], understand? But that doesn't mean or indicate you're a bad person, understand?
>
> Now . . . I don't know what got into your head the night this happened. That's something you can tell me, were you threatened or what? Or did you want to do this, what was it?
>
> [MADRID:] I did it.
>
> [CRUZ:] Sorry?
>
> [MADRID:] Just that I did it.
>
> [CRUZ:] Why? You're not a monster. It's, it's not that simple, why did you do it? You wanted to go up in the gang or what? So then why?
>
> [MADRID:] He [one of the chavalas who was shot] had a problem with me too. Before I was coming that day, he'd argue with me and everything.

The court viewed the video recording of the interview, considered the testimony at the hearing, and denied the motion to suppress. Because some of the court's credibility findings are intertwined with its colloquy with defense counsel, we will reproduce that portion of the suppression hearing:

> [COUNSEL FOR MADRID]: Very brief, Your Honor. We're talking about 36 seconds. And I don't know if the average law student can understand being read their rights in 36 seconds. But, we're talking here

9

about a juvenile who is cold, confused, disoriented. This waiver was not knowingly [sic].

[THE COURT]: He didn't seem disoriented in the video. Did you see anything in his demeanor on the video?

[COUNSEL FOR MADRID]: Well, Your Honor, it was his testimony that he felt disoriented.

[THE COURT]: I know. But, you can't tell it in his demeanor, so therefore it's very hard for me. And I'm just asking did you see anything.

[COUNSEL FOR MADRID]: No, I did not.

[THE COURT]: I'm not saying it wasn't cold in there because they might have had the air on and he only had a shirt. A lot of people don't like air. I believe he was cold.

[COUNSEL FOR MADRID]: All right. So, we do know that it was late at night. He was sleeping when he had the opportunity. And I don't think a 16-year-old at that time can understand enough, and I don't think he did.

[THE COURT]: It is not a blanket for any juvenile. It has to be case by case as to what occurred with this particular juvenile and the next juvenile, et cetera.

[COUNSEL FOR MADRID]: Right. And this juvenile came from another country, where he hasn't heard about Miranda before or he hasn't had any interaction with the police force.

[THE COURT]: That's a fact that sometimes you don't believe when someone gets on the stand and says they're not familiar because they've watched a lot of TV, et cetera. And I understand that, but that doesn't negate whether or not, in fact, Miranda was provided in the manner it was supposed to be provided. That's what I have to look at as well, right?

[COUNSEL FOR MADRID]: Right. And that part I agree. But, he didn't understand, that's my whole point.

[THE COURT]: **He said he did. He said yes.** No one else said yes but him. I mean I watched him in the video. I have to say that his mannerism in the video is very similar to his mannerism as he testifies on the stand. He's very soft spoken. He doesn't speak up. And I think that he exhibited

10

--- it so much mirrors his behavior.  That's just his personality, period.  I don't think he's a big --- you know, just sitting, but he conveys [sic].  I mean I accepted his answers under oath today.  Why would I not accept it in the Miranda given [sic] of the rights?  I'm not sure why not.  It is the same to me.  He acted the same.

To be honest with you, I thought Detective Cruz was a 16-year-old [sic].  I thought he was very calm and very methodical about how he went about asking the questions and what he did with your client.  I thought he, you know --- because I've seen some videos.  I have to be honest with you.  I thought some detectives were off the hook in terms of their mannerisms.  I did not see that.  I think that you take that into account when you have a 16-year-old in front of you as well.

But, you keep going I mean if you still see some violation of the Miranda.  I don't think he has [to make] a choice, card or form.  Yes, it may be in Spanish, but even if you have one in Spanish, if a person doesn't have a higher grade of reading level, they might not understand reading in Spanish.  I mean you just never know.  But, if you do it verbally, then you have that face-to-face.

[COUNSEL FOR MADRID]: Right.  And I do agree that the detective had a choice about what mechanism to use.

[THE COURT]: Right.

[COUNSEL FOR MADRID]: But, they have to choose one that actually conveys the meaning to the person that has to hear it.  That's not what happened here.

[THE COURT]: **Not from the video.  He answered.  He said yes, and then he kept talking.**  [Detective Cruz] provided the Miranda in the way it calls for under the law with respect[] [t]o the voluntariness, and that one statement, ["]we are not going to play all night,["] that just to me is just a statement that, look, we are not going to be here all night.  You either talk or you don't talk.  It's really up to you.  Is that the statement where you say it is not ---

[COUNSEL FOR MADRID]: Yes.  I agree with Your Honor up to a point ---

11

[THE COURT]: I don't get another statement. I didn't hear anything in terms of him saying ["]you are going to have to talk tonight.["] I didn't hear that on the video. I'm sorry.

[COUNSEL FOR MADRID]: That's page seven. Page seven is the one I was talking about.[1]

[THE COURT]: All right. So, I deny your motion with respect to the suppression of the statement both on the grounds of Miranda violation and voluntariness. Thank you.

(Emphasis added.)

We note that, in Madrid's brief in this Court, in addition to the two statements attributed to Detective Cruz that were argued at the suppression hearing ("it is better for you if you talk" and "I can play this game with you all night if you want"), he points to two other statements Detective Cruz made during the interview, neither of which was argued during the suppression hearing. First, he asserts that, in preliminary remarks, the detective told Madrid that he knew Madrid was in the country illegally. In his written motion to suppress, Madrid said: "While he [Detective Cruz] presents this fact in a benevolent light, the effect is to establish a position of power and control in the conversation."

---

[1] On page seven of the transcript of the recorded interview, after asking Madrid some background questions and beginning to seek Madrid's narrative of the prior evening's events, and after Madrid claimed he did not know why he was there, Detective Cruz said to Madrid: "I can play this game with you all night if you want, but I'm not in that kind of, of, of, I don't wanna waste time, understand? I know in your mind you know why you're here OK?" Madrid contended at the suppression hearing that this statement "overbore his will" and "subvert[ed] the required Miranda advice[.]" There is no other statement on page seven that could be characterized as either coercive or an inducement to confess.

12

Second, he points out that the detective told Madrid that his life was in danger from both gangs: from MS-13 because he failed to complete his mission, and from 18th Street gang because of the attack. In his written motion to suppress, Madrid said: "While he [Detective Cruz] does not explicitly complete the thought, the implication is clear that to avoid gang violence upon himself, Darwin needs to confess."

When Madrid testified at the suppression hearing, he made no mention of either of these statements as inducements that encouraged him to confess. Even if we assume arguendo that he did not waive his arguments regarding these statements by failing to bring them to the attention of the court during the suppression hearing, neither of these statements was an improper inducement for Madrid to make an involuntary confession. And, for the reasons we will explain, the suppression court did not err in denying the motion to suppress the statements Madrid made during the recorded interview.

As a preliminary issue, the State argues that Madrid waived his right to challenge the suppression court's ruling by stating at trial that the defense was not objecting to the prosecutor's proposed use of the pretrial statement in connection with the direct examination of Detective Cruz. We conclude that, under Maryland Rule 4-252(h)(2)(C), defense counsel did not waive any right of appeal by failing to renew objections at trial to the admission of portions of the statement. Rule 4-252(h)(2)(C) states:

> If the court denies a motion to suppress evidence, the ruling is binding at the trial unless the court, on the motion of a defendant and in the exercise of its discretion, grants a supplemental hearing or a hearing de novo and rules otherwise. A pretrial ruling denying the motion to suppress is reviewable on a motion for a new trial or on appeal of a conviction.

13

The rule clearly provides that the suppression court's denial of the motion "is binding at the trial *unless*" (emphasis added) there is "a supplemental hearing or a hearing de novo" to relitigate the issue. Neither of those contingencies occurred in this case. The defendant did not move for a supplemental hearing or hearing *de novo*, and the court did not exercise its discretion to revisit or alter the denial of the motion to suppress the statement. Those were the cards the defendant was required to play with at trial. No further preservation of the arguments made in the pretrial suppression motion was necessary because Rule 4-252(h)(2)(C) expressly provides: "A pretrial ruling denying the motion to suppress is reviewable . . . on appeal of a conviction." The current language of the rule could not be more explicit. The result might be otherwise if the defendant moved first (*i.e.*, before the prosecutor) to offer the evidence at trial; but that did not happen in this case. To the contrary, Madrid successfully objected to the admission of the transcript of the interview. By acquiescing in the suppression court's ruling, and not objecting when the prosecutor proposed to play the recording for the jury and then have Detective Cruz translate the Spanish statements, Madrid did not waive the right to seek appellate review of the pretrial ruling pursuant to Rule 4-252(h)(2)(C).

Turning to the merits of the suppression ruling, we note that, in *Gonzalez v. State*, 429 Md. 632, 647–48 (2012), the Court of Appeals described the standard for appellate review of the denial of a motion to suppress an incriminating statement as follows:

> When reviewing the denial of a motion to suppress evidence, "we confine ourselves to what occurred at the suppression hearing. We view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion, here, the State." *Lee v. State,* 418 Md. 136, 148, 12 A.3d 1238 (2011) (citations and internal

14

quotation marks omitted). "We defer to the motions court's factual findings and uphold them unless they are shown to be clearly erroneous." *Id.* (quoting *State v. Luckett,* 413 Md. 360, 375, n.3, 993 A.2d 25 (2010)). The credibility of the witnesses, the weight to be given to the evidence, and the reasonable inferences that may be drawn from the evidence come within the province of the suppression court. *Longshore v. State,* 399 Md. 486, 499, 924 A.2d 1129 (2007) ("Making factual determinations, *i.e.*[,] resolving conflicts in the evidence, and weighing the credibility of witnesses, is properly reserved for the fact finder. In performing this role, the fact finder has the discretion to decide which evidence to credit and which to reject." (internal citations omitted)). "We, however, make our own independent constitutional appraisal, by reviewing the relevant law and applying it to the facts and circumstances of this case." *Lee,* 418 Md. at 148–49, 12 A.3d 1238 (quoting *Luckett,* 413 Md. at 375, n.3, 993 A.2d 25).

A criminal defendant's inculpatory statements to police cannot be used against him unless the dictates of the Fifth Amendment privilege against self-incrimination, as well as due process under the United States Constitution, the Maryland Declaration of Rights, and Maryland common law are satisfied. We made clear in *Williams v. State*, 219 Md. App. 295 (2014), *aff'd*, 445 Md. 452, 128 A.3d 30 (2015), that this analysis has multiple components:

> In Maryland, the overarching law regarding the use of a criminal defendant's confession against him is clear.

> The introduction of a confession as evidence against an accused at trial is permitted only after it is determined that the confession was (1) "voluntary under Maryland nonconstitutional law, (2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights, and (3) elicited in conformance with the mandates of *Miranda.*"

> *Costley v. State,* 175 Md. App. 90, 105–06, 926 A.2d 769 (2007) (quoting *Winder v. State,* 362 Md. 275, 305–06, 765 A.2d 97 (2001)). Thus, a confession must clear all three hurdles before its use as evidence against a criminal defendant is permitted.

15

* * *

The Fifth Amendment to the Constitution of the United States provides that, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona,* the Supreme Court explained that the "privilege against self-incrimination" embodied in the Fifth Amendment applies to individuals who are subjected to custodial interrogation by law enforcement officials. 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "One of the Court's stated aims in establishing the *Miranda* rule is to 'assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process.'" *Lee v. State,* 418 Md. 136, 149, 12 A.3d 1238 (2011) (quoting *Miranda,* 384 U.S. at 469, 86 S.Ct. 1602). In order to combat the "inherently compelling pressures" of custodial interrogation, "which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," any person taken into custody must receive the benefit of certain widely familiar procedural safeguards:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda,* 384 U.S. at 467, 479, 86 S.Ct. 1602.

"After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Id.* at 479, 86 S.Ct. 1602. However, "'[t]he rights expressed in the *Miranda* warning pertain throughout the interrogation.'" *Ballard,* 420 Md. at 488, 24 A.3d 96 (quoting *Lee,* 418 Md. at 150, 12 A.3d 1238). Any and all requests by the person being questioned to exercise his or her *Miranda* right to silence must be "scrupulously honored" by police, and have the effect of "cut[ting] off questioning." *Michigan v. Mosley,* 423 U.S. 96, 103, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Stated another way, if "the right to remain silent is invoked at any point during questioning, further interrogation must cease." *Berghuis v. Thompkins,* 560 U.S. 370, 388, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010).

16

219 Md. App. at 314-16.

With respect to the adequacy of the *Miranda* advisement in this case, when Madrid was asked at the suppression hearing if he understood "any rights that Detective Cruz read to you, any legal rights," he responded, "I don't remember because I don't remember him telling me my rights. I don't remember specifically him telling me my rights." But the video recording clearly established that Detective Cruz did provide Madrid the advice of rights required by *Miranda*. Madrid gave no indication in the recording that he was confused or did not understand anything Detective Cruz had explained to him. Madrid replied in the affirmative when Detective Cruz asked him if he understood the rights that had just been read to him. And, in the answers Madrid gave to questions posed immediately before and immediately after the *Miranda* advisement, Madrid responded appropriately, giving no indication that he was having any difficulty understanding the detective's statements.

Counsel for Madrid conceded at the suppression hearing that Detective Cruz read the required *Miranda* statements to Madrid in a language that he "understands." But, counsel urged the suppression court to find that the warnings were not adequate for Madrid to knowingly and intelligently waive these rights and agree to answer questions or make a statement. In his brief in this Court, Madrid points out that the Court of Appeals held in *Moore v. State*, 422 Md. 516 (2011), that an inculpatory statement made by a 16-year-old defendant should have been suppressed as involuntary. The Court of Appeals observed in *Moore* that "'great care must be taken to assure that statements made to the police by juveniles are voluntary before being permitted in evidence.'" *Id*. at 531

17

(quoting *Jones v. State*, 311 Md. 398, 407 (1988)). But in *Jones*, the Court had declined

to hold that an incriminating statement given by a 17-year-old was involuntary and

inadmissible. The *Jones* Court explained, 311 Md. at 407-08:

> Our cases have held that the age of a juvenile, in itself, will not render a confession involuntary; rather, we have applied the totality of the circumstances test in determining the validity of a juvenile's waiver of constitutional rights and the traditional voluntariness of a juvenile's confession. The absence of a parent or guardian at the juvenile's interrogation is an important factor in determining voluntariness, although the lack of access to parents prior to interrogation does not automatically make a juvenile's statement inadmissible.
>
> In the present case, no evidence was presented that Jones ever requested to see his guardian.

(Citations omitted.)

In *Gonzalez*, the Court of Appeals rejected arguments similar to those made by

Madrid as to why the *Miranda* waiver should be held unknowing or involuntary,

explaining, 429 Md. at 657-68:

> Nor was Petitioner's waiver rendered unknowing by the facts that, at the time, Petitioner was 18 years old, uneducated, and a recent immigrant to the United States unacquainted with this country's criminal justice system. Without more, these facts do not render Petitioner unable, as a matter of law, to make a knowing (or, for that matter, involuntary [sic]) waiver of his *Miranda* rights. Indeed, in *McIntyre v. State*, 309 Md. 607, 526 A.2d 30 (1987), this Court affirmed a trial court's determination that a valid waiver had been obtained from an individual of a much younger age (15 years old), who, evidently, had no prior exposure to the criminal justice system. *Id*. at 625, 526 A.2d 30.

In contrast, the *Moore* Court held that the statement of a 16-year-old defendant

should have been suppressed in a case in which the incriminating statement was not made

until six hours after the *Miranda* rights had been read and the defendant had asked to

speak with his mother thirteen times. 422 Md. at 526-27, 531. But, in Madrid's case, there was neither a coercive delay in questioning, nor a lengthy interrogation, nor an expression of any desire on Madrid's part to speak with anyone outside the interview room.

Under the totality of circumstances, we are persuaded that the suppression court did not err in finding that there had been compliance with *Miranda*. As the Court of Appeals stated in *McIntyre v. State*, 309 Md. 607, 625 (1987): "Applying the relevant totality test to the particular facts of this case, we conclude from our independent review of the record that the trial judge could properly conclude, and did determine with sufficient clarity that the State's proof that there was a knowing and voluntary waiver of constitutional rights satisfied the preponderance of the evidence test."

With respect to the voluntariness of Madrid's confession, there is a two-part test to assess voluntariness under Maryland common law:

> Under that test, an inculpatory statement is involuntary under Maryland common law if (1) any officer or agent of the police promises or implies to the suspect that he will be given special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession, *and* (2) the suspect makes a confession in apparent reliance on the police officer's explicit or implicit inducement.

*Lee v. State*, 418 Md. 136, 161 (2011) (citing *Hillard v. State,* 286 Md. 145, 153 (1979) (emphasis added).

In *Williams,* 219 Md. App. at 330-31, we provided this overview of appellate review of a claim that a confession was involuntary:

> As an appellate court, we "undertake[] a *de novo* review of the [suppression court]'s ultimate determination on the issue of voluntariness."

19

*Knight v. State,* 381 Md. 517, 535, 850 A.2d 1179 (2004). Our review is guided by the following principles of Maryland nonconstitutional law.

"[A] confession that is preceded or accompanied by threats or a promise of advantage will be held involuntary, notwithstanding any other factors that may suggest voluntariness, unless the State can establish that such threats or promises in no way induced the confession." *Hill v. State,* 418 Md. 62, 75–76, 12 A.3d 1193 (2011). In evaluating whether a confession was improperly induced by the police, we are guided by the two-pronged test set forth in *Hillard v. State,* 286 Md. 145, 406 A.2d 415 (1979), and explained again recently by the Court of Appeals in *Hill:*

> [A]n inculpatory statement is involuntary and must be suppressed if: (1) any officer or agent of the police force promises or implies to a suspect that he will be given special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession, and (2) the suspect makes a confession in apparent reliance on the police officer's explicit or implicit inducement. Both prongs of the *Hillard* test must be satisfied before a confession is deemed to be involuntary.
>
> **The first prong of the *Hillard* test is an objective one.** In other words, when determining whether a police officer's conduct satisfies the first prong, **the court must determine whether a reasonable person in the position of the accused would be moved to make an inculpatory statement upon hearing the officer's declaration**; an accused's subjective belief that he will receive a benefit in exchange for a confession carries no weight under this prong. Ultimately, the court must determine whether the interrogating officers or an agent of the police made a threat, promise, or inducement. The threat, promise, or inducement can be considered improper regardless [of] whether it is express or implied.
>
> **If the suppression court finds that the law enforcement officer improperly induced the accused, then the second prong of the *Hillard* test requires the court to determine whether the accused relied on that inducement in making the statement he or she seeks to suppress.** Specifically, the court must examine whether there exists a causal nexus between the inducement and the statement[.]

[*Hill v. State,* 418 Md. 62] at 76–77, 12 A.3d 1193 (emphasis added) (citations and internal quotation marks omitted).

Madrid does not point to any factual errors made by the suppression court with respect to first level findings of fact, nor does he contend that any of the State's witnesses at the suppression hearing were not credible. Madrid did not testify that he was "overwhelmed" by what Detective Cruz said to him; and Madrid did not testify that he made the inculpatory statements *because of* anything Detective Cruz said or did or threatened.[2]

We recognize that a threat or promise of assistance can be improper regardless of whether it is express or implied. *Hillard*, 286 Md. at 153. And, as the Court of Appeals noted in *Hill*, 418 Md. at 80, an improper inducement can come in the form of various offers of a benefit:

> We disagree with the State, however, that only statements offering or implying the officer's assistance in avoiding prosecution qualify as inducements under *Hillard* and its progeny. The thrust of the *Hillard* test is to ensure that an incriminating remark is "free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary." *Hillard*, 286 Md. at 150[.] "Coercive barnacles" can take many forms and are not limited to instances in which interrogating officers promise *their* assistance to the accused. Thus, it is of no consequence that Detective McLaughlin neither promised nor suggested that he would help Petitioner avoid prosecution. It matters only that Detective McLaughlin promised or suggested such assistance by one or

---

[2] *Cf. Lee v. State*, 418 Md. 136, 160 (2011) (The Court observed that, even though the State has the burden to prove voluntariness, "[w]e cannot help but note, nonetheless, that Petitioner did not testify at the suppression hearing. Therefore, we do not have even his word that [the detective's] improper comment overbore his will and produced his confession.").

21

more persons who, from the perspective of a layperson in Petitioner's position, could reasonably provide it.

On the other hand: "[a] mere exhortation to tell the truth is not enough to make a statement involuntary." *Winder v. State*, 362 Md. 275, 311 (2001) (quotation marks and citation omitted).

Madrid points to the following conduct of Detective Cruz as evidence of improper inducements that caused Madrid to make an involuntary statement. Detective Cruz told Madrid he knew Madrid was in the country illegally. When Madrid claimed he did not know why he was being questioned, Detective Cruz told him "I can play this game with you all night." And Detective Cruz told Madrid that his life was in danger from his own gang as well as from the shooting victims' gang. We perceive no improper inducement in any of these statements. These statements were simply descriptive of the serious position in which Madrid had placed himself.

Applying the *Hillard* test for voluntariness, the transcript of the recorded statement clearly shows that these statements were not accompanied by any promises, express or implied, to provide Madrid special assistance in exchange for an incriminating statement. Consequently, the suppression court did not need to make a finding that one or more of these statements was relied upon by Madrid. And, as noted above, Madrid's own testimony did not assert that his confession was induced or motivated by any of these statements.

The sole comment of Detective Cruz described by Madrid himself at the suppression hearing (that it would be better for him if he talked) was denied by Detective

22

Cruz, was not supported by the video recording, and—even if the suppression court had found (which it did not) that such statement was made by the detective—was an exhortation to tell the truth, unaccompanied by any offer or promise of assistance.

In *Clark v. State*, 48 Md. App. 637, 644 (1981), we observed that "a mere caution to make a true statement, without more, does not make a subsequent statement inadmissible." We explained:

> [T]he Court [of Appeals] has held that mere exhortations to tell the truth, and nothing more, are not improper. "I want you to tell the truth" has been held not to be an improper inducement. *Nicholson v. State, supra*. Similarly, in *Deems v. State*, 127 Md. 624 (1916), an officer's questions to the accused of "why [didn't he] tell the truth" and the statement that "the truth would hurt no one" did not render the confession inadmissible. In *Merchant v. State*, 217 Md. 61 (1958), the officer told the appellant, in response to a question, that he did not know if things would go easier if he made a statement and he could make no promises. He added, "the truth hurts no one." The court did not think the generalization could be viewed as a promise of leniency, especially where the accused was told any statement could be used against him. Neither is it an improper inducement for an officer to tell an accused to "get it off his chest." *Bean v. State*, 234 Md. 432 (1964).

*Id.* at 645 (footnote omitted).

Similarly, the Court of Appeals said in *Winder*, 362 Md. at 311:

> We also require a promise or offer within the substance of the officer's eliciting statement. Although a defendant need not point to an express quid pro quo, "[a] mere exhortation to tell the truth is not enough to make a statement involuntary." *Reynolds*, 327 Md. at 507, 610 A.2d at 788. For example, in *Ball*, we held that **an interrogating officer's statement that the suspect would be "much better if [he] told the story" was not sufficient to render a suspect's inculpatory statement involuntary**. *See Ball*, 347 Md. at 174, 176, 699 A.2d at 1178–79. To similar effect, in *Ralph v. State*, we concluded that **an interrogating officer's statement that "it would be better if he told the truth" did not render a custodial confession involuntary**. *See Ralph*, 226 Md. 480, 486–87, 174 A.2d 163, 166–67 (1961).

(Emphasis added.)  *But cf. Streams v. State*, 238 Md. 278, 281 (1965) ("[I]t would be better for [you] if [you] made a statement because if [you] did they would try to get [you] put on probation" was held to be an improper inducement.).

And Maryland courts have recognized that lying to the suspect and feigning sympathy are not off limits to interrogating officers. In *Lee*, 418 Md. at 159, the Court of Appeals stated: "Lying to the suspect about the strength of the evidence against the defendant and showing false sympathy for the suspect, for example, do not rise to the level of the type of police coercion that is viewed as overbearing the will of the suspect. Indeed it is the rare and extreme case in which a court will find that a suspect confessed involuntarily." (Citations omitted.)[3]

Although Madrid did not argue at the suppression hearing that the detective's references to danger from both MS-13 and the 18th Street gang induced his inculpatory statement, he argues in his brief in this Court that "[i]t is clear that the detective's conveyance of the death threats motivated the 16-year-old to confess."  In support of this contention, he cites *Winder*, 362 Md. at 294, where the Court of Appeals concluded that

---

[3] Lee's conviction was reversed because the Court of Appeals concluded that the detective's assurance of confidentiality cancelled out Lee's earlier waiver of his *Miranda* rights. The detective had induced Lee to make an incriminating statement by saying: "This is between you and me, bud. Only me and you are here, all right?" The Court held that this statement "directly contradicted the early *Miranda* advisement that 'anything you say can and will be used against you in a court of law,' thereby vitiating [Lee's] prior waiver" of *Miranda* rights. Nevertheless, the Court also expressly held that the detective's inducing statement "did *not* render Petitioner's statements *involuntary* under either federal or state constitutional law, or Maryland common law." 418 Md. at 162 (emphasis added).

24

the officer's reference to "people . . . who are ready to come out here and do some bad things to you," among other statements, induced the defendant to confess. *Id*. at 316-17. But, in *Winder*, an interrogating officer also assured the defendant: "I can make you a promise, okay? **I can help you. I could help you, I could try to protect you. I can be your friend.**" *Id*. at 289 (emphasis added). In *Winder*, the officer also offered to call the State's Attorney to seek "some help." *Id*. at 290. Later, the officer said: "We will help you inside and we will help you if you would like us too [sic]." *Id*. at 291. The *Winder* Court had little difficulty finding that the interrogating officers had made improper offers of assistance that induced the confession, *id*. at 317-18:

> In the present case, the interrogating officers' statements and conduct go far beyond that in any of our prior cases where improper inducements were recognized. During the twelve hour interrogation, the officers repeated many times that they would help [Winder]. They offered him an apparent means to garner leniency from the state prosecutors and the trial court and protection from an angry mob. The only thing [Winder] had to do in return for these meaningful inducements was confess to a triple murder. The first prong of the *Hillard* test has been satisfied.

Even though Detective Cruz encouraged Madrid to consider the danger he faced from the gangs, the detective made no offers to assist Madrid or protect him if he would confess his involvement in the murder and attempted murder of the enemy gang members. *Winder* does not lead us to conclude that there were improper inducements made to Madrid by Detective Cruz.

We conclude that the circuit court did not err in finding that there were no improper inducements, threats, or promises made by Detective Cruz. That being so, we

25

need not reach the second prong of the *Hillard* test (determining whether or not the defendant relied on an improper inducement).

With respect to compliance with the Due Process Clause of the Fourteenth Amendment and Article 22 of the Maryland Declaration of Rights, the Court of Appeals observed in *Lee*, 418 Md. at 159, that Maryland cases to date have held that both the federal and state constitutional provisions will be satisfied if the confession is not "the result of police conduct that overbears the will of the suspect and induces the suspect to confess." In *Lee*, the Court said that a "totality of the circumstances" test applies. *Id*. at 160. And, in *State v. Tolbert*, 381 Md. 539, 558 (2004), the Court used the test for voluntariness that had been described by the United States Supreme Court as a determination of "whether the confession was the product of an essentially free and unconstrained choice by its maker or whether the defendant's will was overborne by coercive police conduct." (Internal quotation marks omitted.) Madrid's confession was not the product of police overreaching that coerced him to confess. *See Hoey v. State*, 311 Md. 473, 485-86 (1988). As in *Tolbert*, the totality of circumstances in this case leads us to conclude that Madrid's confession was not the result of police conduct that overbore his will and induced him to confess, but instead, his confession was made by him voluntarily.

**II.    Duress**

Although duress is not a defense to the intentional murder of an innocent person in Maryland, *Wentworth v. State*, 29 Md. App. 110, 119 (1975), this Court held in *Wentworth* that duress could "supply that mitigation necessary to lower the degree of

26

guilt from murder to manslaughter." *Id*. at 121. *Cf. McMillan v. State*, 428 Md. 333, 348 (2012) ("It is now well-settled . . . that the defense of duress is a viable defense in Maryland, but that it does not apply in the case of murder." Holding, however, that duress could provide a defense to a charge of felony murder. *Id*. at 353.).

Madrid asked the trial court to instruct the jury on the mitigation defense of duress using MPJI-Cr 4:17.5C from MARYLAND CRIMINAL PATTERN JURY INSTRUCTIONS (2d ed. 2012), which would have told the jury:

### VOLUNTARY MANSLAUGHTER (DURESS)

Voluntary manslaughter is an intentional killing, which would be murder, but is not murder because the defendant acted under duress. This does not result in a verdict of not guilty, but rather reduces the level of guilt from murder to manslaughter. You have heard evidence that the defendant killed (name) under duress. In order to convict the defendant of murder, the State must prove that the defendant did not act under duress. If the defendant did act under duress, the verdict should be guilty of voluntary manslaughter and not guilty of murder.

Killing under the influence of an overpowering force is a mitigating circumstance. This is called duress. In order for this mitigating circumstance to exist in this case, the following four factors must be present:

(1) the defendant actually believed that the duress placed [him] [her] in immediate and imminent danger of death or serious bodily harm;

(2) the defendant's belief was reasonable;

(3) the defendant had no reasonable opportunity for escape; and

(4) the defendant killed the victim because of the duress.

In order to convict the defendant of murder, the State must prove that the mitigating circumstance of duress was not present in this case. This means that the State must persuade you, beyond a reasonable doubt, that at least one of the four factors of duress was absent. If the State has failed to

27

persuade you that at least one of the four factors was absent, you cannot find the defendant guilty of murder, but may find the defendant guilty of voluntary manslaughter.

In order to convict the defendant of murder, the State must prove that the defendant did not act under duress. If the defendant did act under duress, the verdict should be guilty of voluntary manslaughter and not guilty of murder.

The "Notes on Use" that accompany MPJI-Cr 4:17.5C state:

**Use this instruction** if the defendant is charged with first degree premeditated murder under Md. Code Ann., Criminal Law I § 2-201 (2012 & Supp. 2018) (hereinafter Crim. Law I or II § ___ ), second degree specific intent murder under Crim. Law I § 2-204, and/or voluntary manslaughter under Crim. Law I § 2-207, but **only if there is an issue of mitigation generated by evidence of duress**.

(Emphasis added.) In other words, before a defendant is entitled to this instruction that tells the jury "the State must persuade you, beyond a reasonable doubt, that at least one of the four factors of duress was absent," there must be *some* evidence in the case that all of the four factors were present.

The trial court denied Madrid's request to give the jury MPJI-Cr 4:17.5C, based upon the court's conclusion that the instruction was not generated by the evidence in the case. Madrid asserts that this was a reversible error. But we agree with the trial judge that the evidence, even when considered in the light most favorable to Madrid, would not have permitted a jury to conclude that Madrid was acting under duress when he murdered one gang member and attempted to murder the second gang member.

Our conclusion is supported by *Howell v. State*, 465 Md. 548 (2019), a case in which the Court of Appeals affirmed this Court's holding (in *Howell v. State*, 237 Md.

28

App. 540, 564 (2018)) that the evidence in that case was not sufficient to generate a defense of duress. The Court of Appeals explained in *Howell*, 465 Md. at 551-53:

> Duress is a common law defense in Maryland. This Court recently defined duress as follows, citing various treatises and other states' formulations:
>
>> [T]o constitute a defense, the *duress by another person on the defendant must be present, imminent, and impending*, and of such a nature as to induce *well grounded apprehension of death or serious bodily injury* if the act is not done. It must be of such a character as to leave *no opportunity to the accused for escape*. Mere fear or threat by another is not sufficient nor is a threat of violence at some prior time. The defense cannot be raised if the apprehended harm is only that of property damage or future but not present personal injury. . . . [T]he defense cannot be claimed if the compulsion arose by the defendant's own fault, negligence or misconduct.
>
> *McMillan v. State*, 428 Md. 333, 348-49, 51 A.3d 623 (2012) (emphasis added) (internal quotations and citations omitted).To generate this defense, a defendant must meet the "relatively low threshold" of showing "some evidence" of duress. 428 Md. at 355, 51 A.3d 623.
>
> The duress defense serves the public policy that "the law ought to promote the achievement of higher values at the expense of lesser values, and sometimes the greater good for society will be accomplished by violating the literal language of the criminal law." *Sigma Reproductive Health Center v. State*, 297 Md. 660, 676, 467 A.2d 483 (1983). Duress is not premised on a person lacking "the mental element which the crime in question requires." *Id*. Rather, when a person faces a "choice of evils, the law prefers that he avoid the greater evil by bringing about the lesser evil." *Id*.
>
> While duress is available as a defense to many criminal charges, it is "well-settled" that it is not available as a defense to intentional murder. *McMillan*, 428 Md. at 348, 51 A.3d 623. The exception for intentional murder is rooted "as a matter of social policy" in an unwillingness to justify the intentional killing of an innocent person. *Id*. at 350-51, 51 A.3d 623.

(Footnotes omitted.)

Howell was called as a witness at the murder trial of Freddie Curry. Curry had told Howell that he committed the murder, but when Howell appeared to testify at Curry's trial in the Circuit Court for Baltimore City, Howell was threatened by supporters of Curry in the hallway outside the courtroom. In this Court's opinion, we described Howell's account of what happened:

> Howell arrived at the courthouse and waited outside the courtroom to be called to testify. According to Howell, while he was waiting in the corridor, he was verbally accosted and physically assaulted by five or six unidentified men, who threatened him with violence for snitching. Courthouse security intervened and ejected the men from the courtroom. As the men were leaving, one of them told Howell that "you got to come out on the street sometime." The men were not detained or arrested. Within five minutes of the altercation, Howell was called to the stand.

237 Md. App. at 545. Howell then refused to answer any questions even after the trial judge held him in direct contempt for refusing to testify.

After Freddie Curry was acquitted, Howell was indicted on two counts of criminal contempt for refusing to testify in Curry's case. Howell requested a jury trial. 465 Md. at 556. Prior to trial, the State moved to quash a witness subpoena that had been served at Howell's request. At the hearing on the motion to quash, Howell's attorney proffered that the subpoenaed witness would help establish an element of the defense of duress. The circuit court concluded that a duress defense was not available and granted the motion to quash the subpoena. *Id*. at 557-58. The State then filed a motion in limine to "exclude evidence relating to duress on the basis that it was not a valid defense to a contempt charge." After the court granted the motion in limine, the parties agreed to proceed with a bench trial on an agreed statement of facts, and Howell was found guilty of contempt. As

30

noted above, this Court affirmed the conviction, and the Court of Appeals then granted

Howell's petition for a writ of *certiorari*. *Id.* at 558-61.

The Court of Appeals began its discussion by noting, *id*. at 561-62:

### A. *Standard of Review*

There are two issues before us on this appeal: (1) whether, as a matter of law, a defendant charged with contempt for a refusal to testify may raise a duress defense based on fear of reprisal for that testimony; and, if so, (2) whether Mr. Howell presented evidence sufficient to generate a jury instruction on such a defense. Both are questions of law. *See Dykes v. State*, 319 Md. 206, 221, 571 A.2d 1251 (1990). In considering questions of law, we apply the non-deferential *de novo* standard of review. *See* Maryland Rule 8-131(c); *Clickner v. Magothy River Ass'n Inc*., 424 Md. 253, 266, 35 A.3d 464 (2012).

### B. *Availability of a Duress Defense to a Contempt Charge for Refusal to Testify*

As outlined above, with the exception of a prosecution for intentional murder, a defendant in a criminal case may, in appropriate circumstances, seek to be relieved of criminal liability for conduct that otherwise is a crime on the basis of the common law defense of duress. For the defense to be established, there must be a "present, immediate, and impending" threat that induces a well-grounded apprehension of death or serious bodily injury and no reasonable opportunity for escape.

The State argues that a duress defense should not be available to a witness charged with contempt for a refusal to testify in a criminal case for two reasons—one doctrinal, and the other policy-based. The doctrinal argument is that a recalcitrant witness inherently can never prove two elements of the duress defense—immediacy and the lack of any reasonable opportunity to escape. The policy argument is that, even if a recalcitrant witness could satisfy every element of the defense, there should be an exception similar to that for intentional murder because it would render the criminal justice system subservient to intimidation.

But the Court concluded that it did not need to answer the policy issue of whether

a recalcitrant witness could argue that the refusal to testify was due to duress. *Id*. at 564.

31

The Court concluded instead that, as a matter of law, that the evidence proffered by Howell did not meet the threshold level of "some evidence" to generate a duress defense. "Even assuming the defense of duress is available [to a witness charged with contempt for refusing to testify], Mr. Howell's proffered evidence failed to generate that defense in this case because the alleged threat was not 'present, imminent, and impending.'" *Id.* at 566.

The Court acknowledged in *Howell* that a party who requests a jury instruction need only be able to point to "some evidence" in the case to support the instruction, citing *Dykes v. State*, 319 Md. 206, 217 (1990); and the Court observed that "the 'some evidence' standard is not a high bar." 465 Md. at 565. But, because Howell was threatened by persons who were not present in the courtroom when Howell was called to the witness stand to testify, the Court concluded that he "did not proffer evidence of a threat that was 'present, imminent, and impending.'" *Id.* The Court elaborated on its basis for concluding that Howell could not point to "some evidence" of a threat that was present, imminent, and impending:

> When Mr. Howell committed the crime of contempt, he was not under such a threat. Rather, the threat was of "future but not present personal injury." *Id.* [*i.e.*, *McMillan*, 428 Md. at 348.] If all of Mr. Howell's proffered evidence were true, he may indeed have feared that someone might retaliate against him in some way sometime in the future for testifying. Moreover, as noted above and as the Court of Special Appeals recognized, witness intimidation and protection are "exceptionally serious societal" issues. 237 Md. App. at 563-64, 187 A.3d 700. Fear of reprisal can be a valid reason to mitigate the sentence of a witness who refuses to testify and is convicted of contempt. *Id.* at 564, 187 A.3d 700. Be that as it may, the common law duress defense is a poor fit for such fears because of the required element of immediacy. *See United States v. Patrick*, 542 F.2d 381, 388 (7th Cir. 1976) ("[T]he element of immediacy is of crucial importance in any attempt to

raise duress as a defense to criminal charge."). **The dispositive factor here is that the alleged threat against Mr. Howell was not immediate as required for the duress defense**.

*Id*. at 565-66 (emphasis added; footnote omitted).

As in *Howell*, Madrid was not under a "present, imminent, and impending" threat at the time he fired a gun at the two members of the 18th Street gang. He testified to no such present, imminent, and impending threat. He did, however, testify that one of his reasons for carrying out the inter-gang execution was his awareness that his own gang regularly punished members who refused to obey orders from higher ranking members of the gang. And he was concerned that if he did not carry out the order of a "green light" for the enemy gang member, then "that green light would have been for me." Madrid was asked on direct examination: "Darwin, when somebody in MS-13 commits a gang infraction, how quickly do they get punished." Madrid testified: "That I know of, as soon as possible. The following day. As soon as it could possibly be done."  But, as in *Howell*, Madrid's fear that he could face some punishment the following day was not enough to satisfy the requirement of an "imminent" threat. It merely showed that "he may indeed have feared that someone might retaliate against him in some way sometime in the future for" disobedience if he refused to shoot the enemy gang members, *id*. at 565, but, as a matter of law, that did not generate the duress instruction. *Id*. at 566.

The controlling legal restrictions regarding duress, as stated in *Howell*, provide: "'Mere fear or threat by another is not sufficient nor is a threat of violence at some prior time. **The defense cannot be raised if the apprehended harm is only that of** . . . **future but not present personal injury**.'" *Id*. at 551 (quoting *McMillan*, 428 Md. at 348)

33

(emphasis added). As in *Howell*, the absence of an "immediate" threat is "dispositive," *id*. at 566, and leads us to conclude that the trial court did not err in refusing to grant the request to give a duress instruction.

We point out that the State also asserts that the defense of duress was not available to Madrid because he had placed himself in the position of being subject to violent gang punishment by regularly participating in gang activities. This Court held in *Williams v. State*, 101 Md. App. 408, 424-26 (1994), that a claim of duress is not available to a "defendant who intentionally or recklessly placed himself in a situation in which it was reasonably foreseeable that he would be subjected to coercion." *Id*. at 424-25 (quoting 1 WHARTON'S CRIMINAL LAW § 52 (C.E. Torcia, 15th ed. 1993)). We also quoted MODEL PENAL CODE § 2.09(2), which provides that a duress defense is "unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress." We noted that the evidence showed that Williams voluntarily became involved with a "drug organization," 101 Md. App. at 426, and held: "Because Williams's prior conduct contributed mightily to the predicament in which he later found himself, the trial court did not err in concluding that the defense of duress was inapplicable to the instant case." *Id*. at 425-26. Although neither MPJI-Cr 4:17.5C nor MPJI-Cr 5:03 (the duress instruction applicable to crimes other than murder) mentions the fact that the defense is not available if the defendant intentionally or recklessly placed himself in a situation in which it was reasonably foreseeable that he would be subjected to coercion, that limitation was not only the holding in *Williams*, 101 Md. App. at 424-26, but was also noted in *McMillan v. State*, 428 Md. at 348-49 ("there appears to be accord

34

that the defense cannot be claimed if the compulsion arose by the defendant's own fault, negligence or misconduct"), and in *Howell*, 465 Md. at 551 (quoting *McMillan*).

We agree with the State that the evidence in this case, even when considered in the light most favorable to Madrid, leads to the conclusion that Madrid bears responsibility for being a regular participant in the activities of MS-13, and was therefore precluded from arguing to the jury that the known consequences of that participation provided a duress defense when he was told to execute another gang member. There is no basis for the law to conclude that a gang member chooses "the lesser evil," *id*. at 553, by shooting an innocent person to avoid possible punishment from his own gang. As the Court of Appeals observed in *Howell*, *id*. at 565, genuine "[f]ear of reprisal" from the gang member's own gang could possibly be a valid reason to mitigate *the sentence* for a crime committed by a gang member. But such foreseeable coercion that was, as Madrid acknowledged, a known attribute of affiliation with the MS-13 gang, does not support Madrid's argument that his participation in the murderous attack qualified for a jury instruction regarding the defense of duress.

Because the defense was unavailable in this case as a matter of law, the trial court did not err in declining to give a duress instruction.

### III. Sufficiency of the evidence of gang participation

Madrid contends that there was insufficient evidence to sustain his convictions for participation in a criminal gang in violation of CL § 9-804(a) "because the State failed to prove that MS-13 engaged in a 'pattern of criminal gang activity.'" This argument is

contrary to what Madrid's counsel told the jury in the opening statement, when counsel

admitted that Madrid was "guilty of . . . participating in gang activities":

> [COUNSEL FOR MADRID]: He did it. The State has evidence, but that's not our argument. He did it. What matters besides whether someone did it in a criminal trial and in a murder trial is why he did it. What was going on in his head when the whole event happened.
>
> The story here is a story of MS-13. **This was done for the benefit of the gang**. And this was done not out of orders from the bottom, where orders don't come from, it came from orders from above. You will hear that this happened because of a phone call from El Salvador that Darwin [Madrid] thought he had to obey because he got mixed up in MS-13.
>
> Let me tell you a little bit about Darwin. He came to the United States about three years ago with his younger sister from Guatemala, and they lived with their mother and stepfather. Darwin's own biological father also lives nearby, and they have a good relationship as well. He attended High Point High School, but he dropped out. He got a job mowing lawns, and contributing to the family's finances.
>
> Unfortunately, he also got mixed up in MS-13. He's only 16 years old, but that's when everything started going bad. That was his original sin, and **that's what he's guilty of, of participating in gang activities**. And this time, it led to the death of another.

(Emphasis added.)

The argument that the evidence of gang participation was insufficient is without

merit.

As of April 2016, CL § 9-804(a) provided:

A person may not:

> (1)  participate in a criminal gang knowing that the members of the gang engage in a pattern of criminal gang activity; and
>
> (2)  knowingly and willfully direct or participate in an underlying crime, or act by a juvenile that would be an underlying crime

36

if committed by an adult, committed for the benefit of, at the direction of, or in association with a criminal gang.

The statutory definition of "pattern of criminal gang activity" appeared in CL § 9-801(d), which stated:

"Pattern of criminal gang activity" means the commission of, attempted commission of, conspiracy to commit, or solicitation of two or more underlying crimes or acts by a juvenile that would be an underlying crime if committed by an adult, provided the crimes or acts were not part of the same incident.

The statutory definition of "underlying crime" appeared in CL § 9-801(f), which stated:

"Underlying crime" means:

(1) a crime of violence as defined under § 14-101 of this article;[4]

---

[4] As of April 17, 2016, CL § 14-101(a) stated:

(a) In this section, "crime of violence" means:
    (1) abduction;
    (2) arson in the first degree;
    (3) kidnapping;
    (4) manslaughter, except involuntary manslaughter;
    (5) mayhem;
    (6) maiming, as previously proscribed under former Article 27, §§ 385 and 386 of the Code;
    (7) murder;
    (8) rape;
    (9) robbery under § 3-402 or § 3-403 of this article;
    (10) carjacking;
    (11) armed carjacking;
    (12) sexual offense in the first degree;
    (13) sexual offense in the second degree;
    (14) use of a handgun in the commission of a felony or other crime of violence;
    (15) child abuse in the first degree under § 3-601 of this article;
    (16) sexual abuse of a minor under § 3-602 of this article if:

continued…

(2) a violation of § 3-203 (second degree assault), § 4-203 (wearing, carrying, or transporting a handgun), § 9-302 (inducing false testimony or avoidance of subpoena), § 9-303 (retaliation for testimony), § 9-305 (intimidating or corrupting juror), § 11-303 (human trafficking), § 11-304 (receiving earnings of prostitute), or § 11-306(a)(2), (3), or (4) (house of prostitution) of this article;

(3) a felony violation of § 3-701 (extortion), § 4-503 (manufacture or possession of destructive device), § 5-602 (distribution of CDS), § 5-603 (manufacturing CDS or equipment), § 6-103 (second degree arson), § 6-202 (first degree burglary), § 6-203 (second degree burglary), § 6-204 (third degree burglary), § 7-104 (theft), or § 7-105 (unauthorized use of a motor vehicle) of this article; or

_____

continued…

(i) the victim is under the age of 13 years and the offender is an adult at the time of the offense; and
(ii) the offense involved:
    1. vaginal intercourse, as defined in § 3-301 of this article;
    2. a sexual act, as defined in § 3-301 of this article;
    3. an act in which a part of the offender's body penetrates, however slightly, into the victim's genital opening or anus; or
    4. the intentional touching, not through the clothing, of the victim's or the offender's genital, anal, or other intimate area for sexual arousal, gratification, or abuse;
(17) an attempt to commit any of the crimes described in items (1) through (16) of this subsection;
(18) continuing course of conduct with a child under § 3-315 of this article;
(19) assault in the first degree;
(20) assault with intent to murder;
(21) assault with intent to rape;
(22) assault with intent to rob;
(23) assault with intent to commit a sexual offense in the first degree; and
(24) assault with intent to commit a sexual offense in the second degree.

(4) a felony violation of § 5-133 of the Public Safety Article.

Madrid's motion for judgment of acquittal on Counts 7 and 8 was premised on his assertion that there was no evidence that Delincuente was actually in MS-13, and that there was no evidence that the murdered member of the 18th Street gang (Nerio-Rico) was actually the target of the supposed order from Delincuente. At the close of all the evidence, Madrid renewed his motion for judgment on all counts on general sufficiency grounds. The next day, during a discussion about jury instructions, Madrid "re-raised" his motion for judgment of acquittal on Counts 7 and 8, and argued:

> [COUNSEL FOR MADRID]: Your Honor, I did notice something in the statute, so I want to raise --- re-raise the Motion for Judgment of Acquittal on two of the counts, on the sufficiency of the evidence issue. And I'm talking about Count 7 and Count 8, the participation in criminal gangs.
>
> Let me just get the Court to exactly where I'm going. Part of the proof of that is the proof of prior criminal activity. And they put in evidence of other crimes that were related to MS-13.
>
> [THE COURT]: Uh-huh.
>
> [COUNSEL FOR MADRID]: But the way I read the statute is this: It's not that the gang has done any other crimes in the past, but that those --- they have to be what the statute calls underlying crimes. And there's a list of what crimes qualify as underlying crimes.
>
> So both the crime that the person is on trial for today has to be an underlying crime, as well as the crimes that form the basis of the pattern of criminal activity. So I have no argument that the crime of murder is [sic] an underlying crime, because it's a crime of violence.
>
> However, **the four convictions that the State put into evidence** as to the other crimes that have involved MS-13 were --- well, two of them were unspecified felonies. One of them was an unspecified conspiracy to commit a felony. Only one was specified, which was retaliation of [sic] a witness.

39

So in my view, the evidence has not --- there is no evidence that MS-13 has participated in a pattern of criminal activity as defined in 9-801, the definition section that's referenced in 9-804 which is the section that created the crime.

Do you follow what I'm saying?

[THE COURT]: I follow what you're saying.

[COUNSEL FOR MADRID]: Okay.

[THE COURT]: But I'm just not clear why you think that I'm going to take that instruction out based on that argument. I'm not understanding that.

[COUNSEL FOR MADRID]: No, I'm asking for --- I'm asking for a Motion --- I'm asking for a Judgment of Acquittal at this time.

[THE COURT]: Excuse me? Really? Because you don't believe there's a pattern of criminal activity ---

[COUNSEL FOR MADRID]: Right. Because a pattern ---

[THE COURT]: ---- than [sic] shown?

[COUNSEL FOR MADRID]: Right. Because a pattern of criminal activity is defined. That term is defined in 9-801.

[THE COURT]: Well, let me say this: Let's just say, your client got on the stand and said that he collects what he calls rent from people who are operating illegal operations in the County. That's a criminal activity, isn't it? That's how he described it.

[COUNSEL FOR MADRID]: Well, it's not just any crimes, though. It has to ---

[THE COURT]: It's not what?

[COUNSEL FOR MADRID]: The crimes that can f[or]m the basis of the pattern of criminal activity is not any crimes under Maryland criminal law.

[THE COURT]: So it has to be what type of crime? You're saying it has to be a specific crime?

40

[COUNSEL FOR MADRID]: Correct.

[THE COURT]: What specific crime does it state it has to be?

[COUNSEL FOR MADRID]: It's right here in 9-801(f), Underlying Crime. And it's limited to those underlying crimes because of 9-801(c) --- I'm sorry --- (d). It means the commission of, or attempted commission of, or conspiracy to commit an underlying crime.

[THE COURT]: What? All right. Your motion is denied. Thank you.

(Emphasis added.)

CL § 9-804(a) prohibits a person from participating in a criminal gang knowing that the members of the gang engage in a pattern of criminal gang activity. This indicates that the person must have knowledge of the pattern of criminality of members of the gang. In *In re Kevin T.*, 222 Md. App. 671 (2015), we said: "The statute requires the State to prove not only that appellant was a member of a criminal gang, but that the gang, in this instance MS-13, engaged in a pattern of criminal behavior, *i.e.,* committed, attempted to commit, or conspired to commit two or more of the specific 'underlying crimes' listed in § 9-801(f)." *Id.* at 681. There was ample evidence in this case to meet this burden.

Even before Madrid took the stand and admitted that he participated in activities of the MS-13 gang that met the definition of two or more of the underlying crimes listed in § 9-801(f), his fellow gang member Alex had testified about collecting "rent" and going with the MS-13 members to gun down two members of the 18th Street gang on the night of April 16. And the jury heard Sergeant George Norris testify as an expert on gangs and MS-13. Sgt. Norris testified that MS-13 had "probably four or five fully

41

operational" cliques in Prince George's County at the time of trial, and that, in the course of his service for the Prince George's County Gang Unit, he had conducted "hundreds" of investigations into gangs, the majority of which concerned MS-13. Sgt. Norris testified that he had known members of the MS-13 gang to commit crimes ranging from "vandalism and theft to triple murder" and felony "retaliation against a witness." Sgt. Norris noted that "rent" is "extortion money."

Madrid himself testified that, prior to the night that he and three other members of the MS-13 gang transported guns to commit a murder and attempted murder, he participated in the gang's extortion of "rent" from small business operators, and had personal knowledge that the gang had committed a second degree assault upon him as punishment for not always responding to phone calls from gang members.

There was ample unrefuted evidence at trial that Madrid willfully participated in the activities of the MS-13 gang, knowing that MS-13 was a criminal gang that had committed at least two of the crimes that were among those listed in either: § 9-801(f)(2) such as second degree assault; wearing, carrying or transporting a handgun; and retaliation for testimony; or § 9-801(f)(1), such as assault in the first degree; assault with intent to murder; use of a handgun in the commission of a felony or other crime of violence; and murder; or § 9-801(f)(3), such as the crime of extortion.

**JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

42